```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE SOUTHERN DISTRICT OF TEXAS
 2                        HOUSTON DIVISION

 3
     AUDREY K. MILLER,                    )
 4                                        )
              Plaintiff,                  )
 5                                        )  NO. H-15-CV-2824
     v.                                   )
 6                                        ) January 25, 2016
     SAM HOUSTON STATE UNIVERSITY         )
 7   TEXAS STATE UNIVERSITY SYSTEM,       )
                                          )
 8            Defendants.                 )

 9

10

11                       INITIAL CONFERENCE
               BEFORE THE HONORABLE LYNN N. HUGHES
12

13

14

15

16   For the Plaintiff:          Terrence B. Robinson
                                 Mina Madani Banerjee
17                               The Robinson Law Firm
                                 1700 Post Oak Blvd., Suite 600
18                               Houston, TX 77056

19   For the Defendants:         Adam N. Bitter
                                 Office of the Attorney General
20                               State of Texas
                                 P.O. Box 12548
21                               Austin, TX  78711

22   Court Reporter:             Bruce Slavin, RPR, CMR

23

24
         Proceedings reported by mechanical stenography and produced
15:40 25 by computer-aided transcription.
```

1          THE COURT:  Mr. Robinson, we've got four parties

2     instead of the two.

3          MR. ROBINSON:  Oh.  The --

4          THE COURT:  You sued the System and the

15:40   5     institution.  So, pick any two you want.  I don't care.

6          MR. ROBINSON:  I am going to go with the

7     Universities.

8          THE COURT:  Is that right?

9          MR. BITTER:  Yes, Your Honor.  To be clear, you

15:41  10     know, that was an issue that we were going to hope to

11     resolve by --

12          THE COURT:  I just did.

13          MR. BITTER:  Yes, Your Honor.

14          THE COURT:  We'll dismiss the Systems.

15:41  15          MR. BITTER:  Thank you, Your Honor.

16          THE COURT:  Systems don't do anything.  They hire

17     large staffs and go around and make life difficult for the

18     actual institutions themselves.  It's in their charter;

19     annoy their workers.

15:41  20               Have you given the Attorney General all these

21     records she mentioned in her complaint and she had

22     statements from other professors and --

23          MR. ROBINSON:  Yes, Your Honor.

24          THE COURT:  Have you got all that?

15:41  25          MR. BITTER:  We have received them.

1          THE COURT:  Have you read them?

2          MR. BITTER:  Well, we actually had some technical

3    difficulty receiving them.  Mr. Robinson and I worked

4    through some of those issues.  We were just able to resolve

15:42  5    those two days ago, actually.  We just received them --

6          THE COURT:  [To Ms. Banerjee]  I am glad you're on

7    this case.

8          MS. BANERJEE:  Thank you.

9          THE COURT:  How long does it take to resolve the

15:42  10   issue?  You call him and say, 'I couldn't read the PDFs you

11   sent me,' or something and he says, 'I will send them a

12   different way.'

13         MR. BITTER:  Yes, Your Honor.

14         THE COURT:  And, so, you didn't read them.  That's

15:42  15   the long way of saying you didn't read them.

16         MR. BITTER:  I am, at least, aware of the

17   statements.  I have seen some of the documents.  To be

18   clear, they're documents that she had submitted mostly

19   through the EEOC process --

15:42  20               (Simultaneous dialogue)

21         THE COURT:  -- internal processes where she

22   complains.  All that stuff has been gathered, but you've got

23   to read it.

24         MR. BITTER:  Yes, Your Honor.  And I certainly -- I

15:42  25   don't know that it mentioned every single document, but I

1  have read the statements that she submitted in the course of

2  the --

3           THE COURT:  It's not hers, but she said somewhere

4  that she had statements from other people.

15:42  5           MR. ROBINSON:  There are recordings and there

6  are -- There are recordings mostly.

7           THE COURT:  Have they been transcribed?

8           MR. ROBINSON:  Some of them have been transcribed,

9  yes.

15:43  10           MR. BITTER:  And I have listened to the --

11           MR. ROBINSON:  There are 400 things that --

12  exhibits that we sent over.

13           THE COURT:  Master them.  I'm not making her

14  produce all that stuff and the great State of Texas is just

15:43  15  going to sit on them --

16           MR. BITTER:  Yes, sir.  I understand.

17           THE COURT:  -- or use them for coasters.

18               Are you in Austin?

19           MR. BITTER:  Yes, Your Honor.

15:43  20           THE COURT:  I'm sorry.  Maybe you can stop and

21  spend a night in Lockhart on the way down so they can

22  decompress and get used to dealing with normal people.

23               All right.  So, this joint chronology is,

24  singularly, unjoint?

15:43  25           MR. ROBINSON:  Yeah.

1          THE COURT:  So, first -- Who prepared this?

2          MR. ROBINSON:  Well, we did jointly prepare --

3          THE COURT:  No.  But that -- I want to know the

4     data that is undisputed.  So, whoever's got this on their

15:44   5     machine -- that means your client will have to do it -- go

6     through and simply pull out all of them that say both, and

7     you can keep the others and just put them on a different

8     document.  But many of these are not operating documents;

9     they're background documents.

15:44  10          You know, my standard here is a federal

11     statute.  What the American Psychological Society says is of

12     no interest to me because I'd have to get into their

13     standards, if any, and what it all means.  The standard is a

14     nice American statute in a book.  That's the only one I can

15:45  15     apply.  And we have a lot of them about Audrey and Lydia

16     Cruz Fox.

17          We have, you know, in 2011 the associate --

18     When did she file the first complaint?

19          MR. ROBINSON:  The first formal grievance with the

15:45  20     University --

21          THE COURT:  When did she first -- a material change

22     in her position.  When did she -- Okay.  She started in '07?

23     Is that right?

24          MR. BITTER:  Yes, Your Honor.

15:45  25          MR. ROBINSON:  Yes.

1          THE COURT:  So, she starts working in April?

2          MR. BITTER:  I believe it's August of 2007, Your

3    Honor.

4          THE COURT:  And have there been EEOC complaints?

15:46  5          MR. BITTER:  There was an EEOC charge.  I believe

6    the first charge was in May of 2013.

7          THE COURT:  And what happened to that?

8          MR. BITTER:  That was eventually dismissed.

9          THE COURT:  No lawsuit?

15:46  10         MR. ROBINSON:  No.  That's the subject of our

11   current lawsuit.

12         THE COURT:  So, they kept it for a while and

13   then --

14         MR. ROBINSON:  -- issued a right to sue.

15:46  15         THE COURT:  -- watched it get moldy and then gave

16   it to you.

17         MR. BITTER:  To clarify, there were -- and,

18   Mr. Robinson, correct me if I -- there were three amendments

19   to that charge as well that were filed over the course of

15:46  20   2013 and 2014.

21         THE COURT:  And when was the last one?  Or are they

22   all for the same thing but after what we would call a

23   "supplemental petition"?

24         MR. BITTER:  The first two, as I understand it,

15:46  25   were to add supplemental charges.  The third one was simply

1    to add the System as a respondent -- the third amended, I

2    should say.

3            THE COURT:  So, like on May 15, 2012, she got a

4    letter -- and, I'm sorry, I don't know what all these clever

15:47  5    acronyms are -- the DPTAC, Department of Psychology Teaching

6    Assistant Coordinator.

7            MR. BITTER:  It's a promotion.

8            MR. ROBINSON:  Tenure track.

9            MR. BITTER:  Promotion and tenure track, Your

15:47  10    Honor, the department promotion tenure....

11            THE COURT:  All we need here is -- and we drop her

12    courtesy titles -- Miller got a letter from the Tenure

13    Committee about her performance.  That's all I want, because

14    I am going to read the letter.  I don't want the two places

15:48  15    you quoted.  I want to read the whole letter.

16                And you all can agree on that, can't you?

17            MR. BITTER:  I believe so, Your Honor.  We had

18    filed -- as you know, we had filed an advisory last month

19    when it was our interpretation that perhaps the advisory was

15:48  20    due on December 11th.  We were not sure.  We filed an

21    advisory advising the Court that we had -- That was when

22    Miller was unrepresented at the time.  We had tried to reach

23    an agreement with her.

24            THE COURT:  Rosenberg withdrew and --

15:48  25            MR. BITTER:  I understand.  We had submitted a

1    chronology.

2            THE COURT:  She can change lawyers all she wants

3    and wait until she finds one, except she can't stop the

4    case.  It's her responsibility if she wants counsel to have

15:49  5    them.

6                Do you recall whether there were 30 days to

7    replace him?

8            MR. BITTER:  I believe there was a date there.

9            THE COURT:  That's what I normally would say if

15:49  10   it's early in the case.  Now, later in the case I get less

11   sympathetic.  But early in the case, if someone wants to

12   withdraw, I give them 30 days to do it.  But she didn't do

13   it in 30 days, I take it.

14           MR. ROBINSON:  No.  She did it probably in 10 days.

15:49  15           MR. BITTER:  Right.  I only point out to say on

16   December 11th we did file an advisory with what our proposed

17   chronology would be, and I think it may be able to serve as

18   a starting point, because it's only about a page and a half

19   and is, you know, largely factual --

15:49  20           MR. ROBINSON:  Of course, we believe ours is

21   factual.

22           THE COURT:  Well, they may be factual, but they're

23   not operative facts.  If she consulted with the Work Force

24   Commission, Civil Rights Commission, I don't care about

15:50  25   that.  It's not a charge.  It's did she file a complaint.

1      MR. ROBINSON:  Only as a basis of retaliatory

2  behavior.

3      THE COURT:  No.  You don't get retaliation for

4  conferring in private with somebody.  You have to actually

15:50  5  take an action.  Telling your friends at coffee break, which

6  is the most common way, or after work -- It's got to be

7  something that they would have been aware of and had the

8  opportunity to do something about.  Just -- All of her

9  secret challenges for equal rights are awfully nice, but it

15:50  10  has to be specific.  Just to complain about something other

11  than they're a bunch of jerks, which could be true, it may

12  not necessarily be anti-whatever category she complains

13  about.

14          Is it only women or is it -- Is it sexual

15:51  15  discrimination or --

16          MR. ROBINSON:  It's sex discrimination.

17          THE COURT:  That's it?

18          MR. ROBINSON:  And retaliation.  Nothing else.

19          THE COURT:  No race, rational origin, baldness,

15:51  20  any other --

21          MR. ROBINSON:  Sex discrimination.

22          Your Honor, I'm sorry.  I guess what my or my

23  client's, probably, confusion is trying to sort out how much

24  information you actually want in this document.

15:51  25          THE COURT:  I don't like hard writing rules.  I

1  want a good, brief, precise....  I don't want to say you

2  can't put more than 16 words in it and just aim at that.

3          There is a date something happened.  She went

4  to Dallas to see somebody or she didn't.  There are going to

15:51  5  be enough contests.  So, I need a skeleton of the

6  transaction, and I need it in chronological order so I can

7  keep track of what came before what.

8          MR. ROBINSON:  I think she was really just

9  concerned that what didn't go in here, you know, we may have

15:52  10  issues with later, not --

11          THE COURT:  No.  Well, you may, but I don't want to

12  know about these -- I want to know about operative events.

13  And she has a lot of workplace complaints.  They didn't

14  listen to her about her student.  They didn't do this.  They

15:52  15  said that.

16          Unless they're anti-female, the fact that

17  they're incredibly poor-managed, short-sided and stupid --

18  that doesn't -- she has no claim about that.  And, remember,

19  she's working for the State of Texas.  And I dearly love the

15:52  20  State of Texas, but if you can sue them for bad government

21  everybody -- there would be, what, 27 million, whatever it

22  is, Texans in court wanting their taxes back.  This is about

23  sexual discrimination, not about the administration,

24  corruption, any of those things.

15:53  25          MR. ROBINSON:  Your Honor, our thought process was

1    that the things that were done with respect to her were

2    because of her sex.

3          THE COURT:  No.  That's her argument.  But there

4    are things that are done.  Period.  I need to know what was

15:53    5    done.

6                So, if she got a letter saying 'You don't get

7    the promotion to associate professor', that's the key word.

8          MR. ROBINSON:  Associate professor tenure.

9          THE COURT:  Then, that's a datum.  We're going to

15:53    10   have to discuss why it happened.  So, I want to know what

11   happened.

12               I had a car wreck case this morning.  Nobody

13   doubts that this finger and that finger met each other on

14   Interstate 10 one night out east of here.  He says she

15:54    15   turned in to him.  She says he turned in to her.  But we

16   narrowed it down that they were in the two right-hand lanes

17   of Interstate 10 in Uvalde and they hit each other.  That's

18   a place to start.  Actually, from the complaint, you knew

19   none of that; all you knew there was a car wreck on I-10.

15:54    20   The first thing we did is figured out where they were and

21   what happened.

22               That one party was horrible and disgusting and

23   the other saintly is pretty much standard fare.  That's why

24   I need to narrow down....

15:54    25               And some of these are just her recollections

1    of the conversation.

2                    Did she record the May 18th, 2012, thing

3    where -- Jorge Varela?

4              MR. ROBINSON:  I think what she did often was an

15:55   5    e-mail, document it.

6              THE COURT:  Okay.  But there is a, quote, "blemish

7    on Dr. Miller's track record here when you get up for tenure

8    in a few months."  But I don't know what a junior member of

9    the faculty would have to say about tenure, although the

15:56  10    State has strange processes.

11                    Who is on the tenure committee?

12              MR. BITTER:  Well, on this departmental committee

13    it's just tenured faculty.

14              THE COURT:  So, the junior member wouldn't be

15:56  15    tenured?

16              MR. BITTER:  Yeah.  I am just not sure what that

17    characterization means, if it's --

18              THE COURT:  Well, "junior in service".  So, you

19    could be a short-term Ph.D. from Berkley.  I assume they

15:56  20    have a psychology department.  They certainly have plenty of

21    crazy people in California.

22              MR. BITTER:  In Dr. Miller's case the tenure

23    committee had ten members, I believe, all tenured faculty in

24    the psychology department.

15:56  25              THE COURT:  All right.  Here's something you could

1    do.  Do you have a smart, young person on your staff?

2          MR. BITTER:  We do.

3          THE COURT:  They could do a flow chart of the

4    tenure process at Sam Houston State Teachers College --

15:57    5    that's what it used to be -- so we know -- and then just a

6    brief description of who is on the committee, all tenured

7    faculty.  It has to go three other places or it's not a real

8    university.  Tenure is a scarry thing.  I didn't get mine

9    from a tenure committee.

15:57   10          And the May 31 entry is that somebody valued

11   this Jorge Varela -- V-a-r-e-l-a -- opinion over hers.  That

12   has nothing to do with this.  It has to do with the merits

13   of the opinion.

14          No.  Disagreeing on the work, saying,

15:58   15   'Robinson, I want you to drill a second hole next to this

16   one on that flange,' and somebody tells him, 'No.  No.  What

17   you oughta do is do a lateral,' it can't be about my race or

18   yours.  That has to do with where the hole is.  I have a

19   minor in psychology.  Things have a little less precision in

15:58   20   psychology.

21          So, there is a whole series about her getting

22   criticized listening to this other guy.

23          MR. ROBINSON:  Your Honor, if I may suggest, if

24   some opinions are valued over other opinions on a consistent

15:59   25   basis, that would --

1      THE COURT:  You can't do it, because you're not in

2  a position, he's not in a position and I'm not in a position

3  to evaluate -- and I don't know what the opinion is,

4  probably something psychological.  Now, if one or both of

15:59  5  them defies common sense, it might still be good psychology,

6  but I disagree with some of my colleagues fairly

7  consistently regardless of race, creed, color, sex or

8  national origin.

9      MR. ROBINSON:  But this situation was an opinion, I

15:59  10  believe, around something that is pursuant to policy.

11      THE COURT:  Well, I don't know what that means.

12      MR. ROBINSON:  Well --

13      THE COURT:  Outcomes of research can't be

14  pursuant --

15:59  15      MR. ROBINSON:  Well, there is a committee that

16  reviews a thesis, and she's on the committee.  And pursuant

17  to the policy surrounding how you're supposed to work with

18  that thesis and critique that thesis, she's supposed to have

19  an opinion; and her opinions are supposed to be, actually,

16:00  20  at the level of potential veto on what the thesis would

21  ultimately be.  And she was --

22      THE COURT:  How many other people have a veto?

23      MR. ROBINSON:  Everyone on the committee.

24      THE COURT:  Okay.  So, why does his veto trump her

16:00  25  consent or vice versa?

1          MR. ROBINSON:  It was vice versa.  She had an issue

2     with it.

3          THE COURT:  And they didn't take it.  That

4     doesn't -- She's a Ph.D. at a major state university and she

16:00      5     has a disagreement with her colleagues about the substance

6     of a thesis.  She can't convert -- Otherwise, everybody she

7     wanted to get their thesis passed would have to get it;

8     otherwise, it's racial or sexual.  That's not what the Act

9     is about.  It's about major decisions, material decisions in

16:01     10     her benefits, pay, stuff like that.

11          And I may have to get into this, but I can't

12     do it -- I want it to be an outline of agreement.  Like I

13     say, you can give me a list and you can give me a list of

14     what the great State of Texas -- They need to be the facts,

16:01     15     and that can be summarized in "Miller objected to people

16     listening to" --

17          MR. ROBINSON:  I think it was --

18          THE COURT:  -- whatever his name is, "and she filed

19     a grievance with the University."  That's a nice fact.

16:02     20          Step one under the policy was August 3rd,

21     2012....

22          MR. ROBINSON:  Your Honor, part of it was that,

23     because there's so many documents in such a short amount of

24     time, to review all of them -- I mean, I had 139,000 pages

16:02     25     of documents.  He was not comfortable with some of the

1    things we were saying because he didn't know for sure if

2    that was accurate.  So, there was just not enough time for

3    him to be comfortable that I was -- that what she was

4    alleging is true.  So, we could not come up with some facts

16:02    5    that....

6            THE COURT:  This long quote of hers in her

7    grievance that she thinks collegiality is a mask for male

8    domination and they all have stereotypical views of her --

9    Maybe her views are no good.  She has to prove that her -- I

16:03   10    mean, we're not going to get into that.

11            What did the committee decide?  I like the

12    words it's "being applied subjectively".  In psychology

13    isn't that what it's all about?  Somebody says something and

14    the psychologist says, 'Mmm-hmm.  We know what they really

16:03   15    mean.'  So, "subjectively" can't be....

16            What discipline does the provost come from?

17            MR. BITTER:  Provost He-bert [phonetic]?

18            THE COURT:  Uh-huh.

19            MR. BITTER:  From mathematics/statistics.

16:04   20            THE COURT:  I believe that's "A-bear" [phonetic],

21    would be my guess.

22            MR. BITTER:  That may be correct.  Statistics

23    specifically.

24            THE COURT:  And "Jamie", is that a boy or a girl?

16:04   25            MR. BITTER:  A male, Your Honor.

1    THE COURT:  Well, he is obviously biased against

2    the other males if he said all this stuff.  You can't do

3    that.  I don't know Hebert, but that's -- he can't say there

4    is no way of stopping you from getting -- I mean, say it.

16:04   5    He had no authority to say that.  The whole process....

6         So, apparently, what Hebert says is you've got

7    the qualifications for tenure, they voted on that and

8    approved it, and then a couple of people criticized you.

9         MR. ROBINSON:  And denied tenure, Your Honor.

16:05   10    THE COURT:  Well, I can't tell from this four-inch

11    quotation what happened.  All we know is....

12         I want to know did Hebert grant tenure?  Was

13    that his decision?

14         MR. ROBINSON:  The committee would determine

16:05   15    tenure.

16         THE COURT:  No.  They have got to recommend tenure.

17    You can't turn over the institution to the monkeys.  You

18    have got to have somebody outside of the -- otherwise, the

19    departments gets together and go crazy, not unlike the law

16:05   20    school did at Texas here recently.

21         [To Mr. Bitter]  Don't comment on that.

22    That's your client, indirectly.

23         MR. ROBINSON:  I think that individuals submitted

24    letters with respect to their opinions about tenure.  She

16:06   25    was denied tenure.

1          THE COURT:  And they're not entitled to their

2     opinion?

3          MR. ROBINSON:  They are unless it's based on

4     retaliation.

16:06    5          THE COURT:  Look.  A negative comment is probably

6     not actionable no matter what because it's not an operative

7     event.

8               How many people were on -- Ten people on the

9     committee?

16:06   10          MR. BITTER:  On the department's tenure committee.

11          THE COURT:  Well, I don't know which one -- Let's

12     see what she's talking about.  She was mobbed -- he says,

13     she says, that -- she says he says that she was mobbed at

14     the departmental meeting.

16:06   15               What did Hebert say?  What was his role in

16     this?  Well, that was just a grievance.  That wasn't even a

17     part of the -- So, in a grievance he says a bunch of stuff

18     that has nothing to do with the actual process of granting

19     or denying tenure.

16:06   20               But it's clear she was denied tenure.  Do you

21     all agree about that somewhere?

22          MR. BITTER:  Yes, Your Honor.  That was in February

23     of 2013.  The August, 2012, meeting with Provost Hebert came

24     before the tenure application was submitted.

16:07   25          THE COURT:  And it wasn't a tenure meeting.

1          MR. BITTER:  The immediate --

2          THE COURT:  Hebert's grievance was part of the

3    internal grievance process, not part of the tenure process.

4          MR. BITTER:  Your Honor, I think we actually

16:07    5    dispute it's even a grievance meeting.  It was a meeting.

6          THE COURT:  Well, it's not tenure.

7          MR. ROBINSON:  We see it as a tenure.  She made

8    complaints prior to the tenure denial.

9          THE COURT:  But he was not expressing anything that

16:07    10   was intended to affect the tenure decision.

11         MR. ROBINSON:  He specifically stated that he

12   thought --

13         THE COURT:  He can't do it in a grievance.  His job

14   in -- What did she ask for when she filed the grievance?

16:07    15   MR. ROBINSON:  To stop the hostile work environment

16   and the treatment that she felt was sexist.

17         THE COURT:  And the what?

18         MR. ROBINSON:  To stop the hostile work environment

19   and the treatment that she felt was sexist in the

16:08    20   department.

21         THE COURT:  Okay.  It doesn't have anything to do

22   with the tenure decision, does it?

23         MR. ROBINSON:  Only if it was used later as a

24   basis --

16:08    25   THE COURT:  No.  He can't make the tenure decision.

1    She wanted him to intervene and make things different for

2    her.  So, I don't -- Do I have here what he -- Did he ever

3    do anything -- that is, have a counseling session with the

4    tenure committee or...?  That's a fact that she complained

16:08    5    under the policy to the provost and they had a meeting.

6    That's all that page of data -- for a fact.

7                All right.  She complains a lot about these

8    people, like Conroy, a woman, asking her to defer a research

9    project and then it says "a member of the committee".  Well,

16:09   10    every tenured professor is going be a member of the

11    committee, as I understand it.

12            MR. BITTER:  Well, the committee only had ten

13    people -- the department committee -- so, not every tenured

14    faculty member would have a member of the committee.

16:09   15            THE COURT:  You're talking about --

16            MR. BITTER:  No.  All of the members would have

17    been tenured faculty, but the department had more than ten

18    tenured faculty.

19            THE COURT:  How many shrinks do y'all need out

16:09   20    there?

21                All right.  I was confused.

22                So, Mary Alice is one-tenth of the tenure

23    committee.

24                And was Conroy a stooge for the men?

16:10   25            MR. ROBINSON:  Yes.

1          THE COURT:  How do we know that?

2          MR. ROBINSON:  That's what my client believes.

3          THE COURT:  That's not a fact.

4          MR. ROBINSON:  I didn't say that.

16:10     5          THE COURT:  She complains about subjectivity

6     before, and now she wants everything that happens there to

7     be judged on her subjective appraisal.  That is zero

8     evidence.  We have to have facts.  She has to prove her

9     case, not feel her case.  That's a difference in

16:10    10    terminology, which is a difference in substance.

11              And down here January 24th, '13, Wilson -- I

12    forget who that is now -- said she thought everything would

13    be okay.  That's not an operative fact.  "...and did say

14    anything could go wrong."  Well, that's true, after we,

16:11    15    finally, have another agreement here.

16              And you disagree that February 4th they voted

17    to deny or recommend denial?  There are two February 4th

18    entries.  Everybody says they met, and apparently the

19    Plaintiff disagrees that they voted to deny.  I thought we

16:11    20    agreed on that, recommending --

21          MR. ROBINSON:  I think it may be just the date....

22    I don't think we have any knowledge as to when the vote

23    occurred.

24          THE COURT:  Well, it occurred on the 4th or

16:11    25    afterwards, didn't it?

1          MR. ROBINSON:  Yes.

2          THE COURT:  Well, it's got to be in the papers

3    somewhere.

4          MR. ROBINSON:  When they voted?

16:11   5          THE COURT:  Sure.

6          MR. BITTER:  I believe it was the 4th, Your Honor.

7          MR. ROBINSON:  I don't have any problem with that.

8    I mean, I don't know why it's not noted --

9          THE COURT:  It is now.

16:12  10               What is the CDA CPT?

11         MR. BITTER:  So, that is the -- I mentioned the

12   department tenure committee.  There is also a tenure

13   committee for the College of Humanities and Social Sciences.

14   That is made up of faculty from around the college.  They

16:12  15   make recommendations directly to the dean of that college.

16   So, they're somewhat outside --

17         THE COURT:  So, the department recommends it to the

18   college committee, and the college makes a recommendation to

19   the dean, and the dean recommends it to the provost?

16:13  20         MR. BITTER:  This is where your idea of a flow

21   chart may prove most appropriate.

22               The departmental committee makes the

23   recommendation to the departmental chair.  The departmental

24   chair makes a recommendation to the dean.  The dean makes a

16:13  25   recommendation to the provost, and then the provost to the

1    president of the University.  And then, separately, the

2    college committee -- they review the application.  Their

3    recommendation just simply goes directly to the dean.

4              THE COURT:  And, so, this is the dean of Humanities

16:13  5    and Social Sciences?

6              MR. BITTER:  Yes, Your Honor.  The College of

7    Humanities and Social Sciences, yes, Your Honor.

8              THE COURT:  All right.  So, that's my point,

9    Mr. Robinson; that this committee has to be reviewed by

16:14  10   this, this, commented on by this committee, go to the

11   provost and then to the president.  Right?

12             MR. ROBINSON:  Yes.  That must be the case.

13             THE COURT:  Plus or minus one level of bureaucracy.

14             All right.  On February 5 the departmental

16:14  15   committee sends to the other committee a four-page letter.

16   Only one day after, where they did something proper to the

17   college, that's suspicious.  What's wrong with that?  They

18   held their meeting.  They took a vote.  The next day they

19   wrote a letter to the next level.  Right?

16:15  20             Now, the Plaintiff doesn't like what he said,

21   but I'm not asking her to prove its content.  The content is

22   the content.  I am asking her to tell me what happened.  And

23   the next day there was a letter.  So, that seems to be

24   without any quarrel about that.

16:15  25             The next one, February 6, is another complaint

1     about they did it promptly.  They don't have to take two

2     weeks.  If she feels bad that they did it promptly -- I wish

3     the senate hadn't taken eight months getting ready to

4     send -- plus the Justice Department and all their background

16:15  5     checks and stuff, all of which were fine.  It just took them

6     forever to get it done.

7              So, the department chair concurred and told

8     Castro, the dean.

9              February 10th.  That other female student may

16:16  10    be a bitch, just like another male student may be a SOB.

11    That's not sexism, assuming it's based on her performance as

12    a colleague and as a teacher.

13         MR. ROBINSON:  I would imagine that there are women

14    who would disagree.

16:16  15         THE COURT:  There may be, but they're not a legal

16    standard for employment opportunity.  And, besides, the

17    person who has a right to complain about that would be the

18    student and not a collateral professor.  And I have no idea

19    about -- you know, there are a lot of claims about ClinDoc

16:17  20    workloads and course loads and things.  Surely --

21              How many did you say there are?  How many

22    professors of psychology with all the classes, ranks and --

23         MR. BITTER:  It varied over time.  I think,

24    generally, in the 15 range, again, up and down at times.

16:17  25         THE COURT:  Couldn't we pick -- What year do you

1   want me to pick to get all their teaching loads and clinic

2   loads?  Because not all of them were in clinical doctorate

3   work.  Well, that's --

4                Did she already have her doctorate or she was

16:18   5   a master's -- She had her doctorate?

6                MR. BITTER:  That's correct.

7                THE COURT:  So, why is she in a clinical

8   doctorate -- It's a doctorate for the students?

9                MR. BITTER:  That's right.  So, some professors

16:18   10   were not in the clinical doctoral program.  She was one of

11   them that was.

12                THE COURT:  Do you know how many were in that?

13                MR. BITTER:  I'm not sure.  I think probably a

14   little more than half, is my understanding, but, again, it

16:18   15   varied at times.  So --

16                THE COURT:  Do a ClinDoc - because we want to talk

17   acronyms - in 2014?  '13?

18                MR. ROBINSON:  Well, she was denied tenure in 2013,

19   and I guess it's at the beginning.  So, it would have to be

16:18   20   2012-2011.

21                THE COURT:  Okay.  So, I don't -- So, which one do

22   you want?  '12 or '13?  We have got to start somewhere.

23                MR. ROBINSON:  I want '11 and '12.

24                THE COURT:  No.  You've got to pick one year to

16:19   25   start with.

1        MR. ROBINSON:  Then, I'll say '12.

2        THE COURT:  '12.  We want the ClinDoc -- whatever

3    the precise data is for the program.  I am not going to tell

4    you what to put on the chart, but there has to be some

16:19  5    statistical evidence, because she thinks she was doing more

6    than everybody else.  But I think I do more here than all my

7    colleagues.  There's no statistical evidence of that.  I

8    still feel aggrieved.

9             And then -- and, apparently, Miller says that

16:19  10   she had not only more clinical doctorate responsibilities

11   but higher teacher loads than current professors.  Is that

12   right?

13       MR. ROBINSON:  I think so, yes.

14       THE COURT:  So, can we just do the teaching loads

16:20  15   for people in the clinical doctoral program or -- If she got

16   some --

17       MR. ROBINSON:  Well, I guess it would be whoever --

18   the individual who was setting the loads.  I'm not sure if

19   that applied --

16:20  20       THE COURT:  It's whatever the loads are.  First,

21   we've got to see whether she had a disproportionate load

22   before we go psychoanalyzing whoever set the schedules.

23       MR. ROBINSON:  Well, I'm just saying whatever group

24   that person managed, and I'm not sure whether that was

16:20  25   limited to the ClinDoc or --

         1          THE COURT:  She is complaining about too much in

         2     the clinical doctorate program.  If there is a Latin

         3     American outreach program, those course loads will vary

         4     based on the whims of that program, which won't be

16:20    5     comparable to ClinDoc, or -- There may be a, you know, jail

         6     psychology program.

         7          MR. BITTER:  And to add a finer point, I mean,

         8     there may be a relevance to adding something more than just

         9     the supervision capacity, if you will.

16:21   10          THE COURT:  Whatever are the ways that, if you had

        11     a manager do this stuff, that they would look at -- If the

        12     auditors came in and wanted to see why y'all were spending

        13     so much money, then they would want to see something,

        14     whatever it is that they're supposed to be doing with their

16:21   15     time.  It's hard on the philosophy department because they

        16     count putting their feet on their desk and thinking great

        17     thoughts as productive time.

        18              Surely, the University has some expectation.

        19     You could call them variables of performance or variables of

16:21   20     workload assignment.  And I don't want a vague, just

        21     wandering bureaucratic response.  I want a chart.  And no

        22     field can have a label more than four words and they have to

        23     be short.

        24              And then let's go ahead and -- just so the

16:22   25     data is available, the names and the sex of everybody in

1    these committees and the chain all the way up to the

2    president.  Can we pick a year for that?  Because I don't

3    know what the turnover is on the committees.  '13?

4          MR. BITTER:  I would think we would do -- I mean, I

16:22  5    think it would make the most sense to do the committees that

6    reviewed her application.

7          THE COURT:  Yes.  And the chair and the dean and

8    the provost and the president.

9          MR. BITTER:  Yes, sir.

16:22  10          MR. ROBINSON:  During that time frame.

11          THE COURT:  Yeah.  So, '13?  Well, they denied it

12    in February '13 or started the recommendation.

13          MR. BITTER:  That's correct.

14          THE COURT:  Spring semester of '13.

16:23  15          MR. BITTER:  Yes, Your Honor.

16          THE COURT:  All right.  And have somebody with the

17    University -- Do you have a contact there?

18          MR. BITTER:  Yes, Your Honor.

19          THE COURT:  Who?

16:23  20          MR. BITTER:  Within the general counsel's office.

21          THE COURT:  No.  They don't know anything.  I want

22    somebody who may be a former chair under psychology or

23    whatever who would understand both how the University works

24    and what these things are and can explain them to me.

16:24  25                People say they want a corporate

1    representative and they send down the general counsel or a

2    secretary.  I want somebody who walked on the deck or welded

3    the pipe or something that knows what they're doing for a

4    living down there.

16:24   5         MR. ROBINSON:  Your Honor, I would also note there

6    is an equal pay aspect to this.

7         THE COURT:  Well, get the pay of everybody in the

8    ClinDoc.

9              Now, to be candid with you, Mr. Robinson,

16:24  10    there is nothing that she didn't complain about.  Anything

11    anybody did for two and a half, three years, was all for

12    some ulterior motive.

13              And she recorded a bunch of statements?  How

14    did she do that?

16:25  15         MR. ROBINSON:  She had a recorder on her, I would

16    assume, her phone.

17         THE COURT:  Ask her -- Do you have the originals?

18         MR. ROBINSON:  They're just files.  They're

19    computer files.

16:25  20         THE COURT:  Did she tell the people she was

21    recording them?

22         MR. ROBINSON:  (Indicates)

23         THE COURT:  You have her personnel file?

24         MR. BITTER:  Yes, Your Honor.

16:25  25         THE COURT:  And do you need anything else from her

1    background?

2            MR. BITTER:  I don't believe we will, Your Honor.

3            MR. ROBINSON:  Your Honor, her personnel file -- we

4    don't have -- again, I don't believe were actually produced

16:25   5    in the process of the initial disclosure.

6            THE COURT:  Do you want the personnel file?

7            MR. ROBINSON:  We want the personnel file.

8            MR. BITTER:  And we did produce the personnel file

9    as part of initial disclosures.  I'm aware that there may

16:26  10    have been --

11            THE COURT:  Both of you have got to read.  She

12    can't do everything [referring to Ms. Banerjee].

13            MR. ROBINSON:  But I believe they have these

14    performance evaluations and things like that --

16:26  15            THE COURT:  I want data about her operations there

16    at the school.  So, if there are time and attendance

17    problems, if there are pay problems, if there are --

18    whatever you all have.

19            And what happens is institutions keep three

16:26  20    different files.  There will be a personnel file, a

21    management file and then maybe an insurance file or

22    something.  The shop foreman's reports never make it to the

23    personnel file.

24            All right.  And then has she produced a list

16:26  25    of every place she applied for employment and when she

1   applied for it?

2           MR. ROBINSON:  I believe we have, yes.

3           MR. BITTER:  And I have received that, yes.  I

4   reviewed it.

16:27   5           THE COURT:  And what is she doing now?

6           MR. ROBINSON:  She is not employed now.

7           THE COURT:  What is she doing?  Then, there needs

8   to be how many interviews or applications has she sent this

9   year.

16:27   10           MR. ROBINSON:  I believe we did provide the --

11           THE COURT:  How many?

12           MR. ROBINSON:  I have to look back in my files.

13           THE COURT:  It's only been a month.  She is

14   statutorily obliged to mitigate her damages.  How is she

16:27   15   living if she's not working?

16           MR. ROBINSON:  Well, she is married and her husband

17   has an income.

18           THE COURT:  Well, if she is living off of him,

19   that's not unemployment.  If she decided --

16:27   20           MR. ROBINSON:  Well, she has not decided to live

21   off of him.

22           THE COURT:  Well, that's what she's doing.  And she

23   would be more motivated to find a job if she were relying on

24   her own income.  So, she needs to do a responsible job to

16:28   25   mitigate and not claim her absence from work is due solely

1    to the University.

2              Did you know about this conversation or

3    whatever it was with Texas State University?

4              MR. BITTER:  You mean the University of Houston or

16:28  5    with --

6              THE COURT:  Is that who it was?  Oh.  That's right.

7    You're now part of the Texas State System?  I didn't

8    understand Texas State.

9              MR. BITTER:  Texas State was named and Sam Houston.

16:28  10   Sam Houston State University is part of Texas State.

11             THE COURT:  Sam Houston is?

12             MR. BITTER:  Yes, Your Honor.

13             THE COURT:  But you're part of your own system.

14             MR. BITTER:  Sam Houston State or --

16:28  15            THE COURT:  No.  The University of Houston.

16             MR. BITTER:  Yeah.  University of Houston Downtown

17   is part of the University of Houston System.

18             THE COURT:  Aren't there other schools?  I mean,

19   there is Victoria, Clear Lake....

16:29  20            MR. BITTER:  Yes, one of several component

21   institutions.

22             THE COURT:  Other than that -- Well, how many

23   components does Houston have?  Find that out.  Apparently,

24   some of them -- A&M has got them all over the place.

16:29  25                UT is trying to open a UT branch in Houston

33

```
 1   without permission, following the typical bureaucratic they
 2   had signed the contract to buy 300 acres and then seeking
 3   permission.  'Well, we have already got this plan.'
 4              Isn't Prairie View part of the A&M System now?
 5   What's it part of?
 6              MR. BITTER:  I am not certain.
 7              THE COURT:  You're not certain.  You have got no
 8   idea.  Just admit it.
 9              Where did you go when you had your teeth?
10              MR. BITTER:  I went to undergraduate at the
11   University of Texas.
12              THE COURT:  And where did you go to law school?
13              MR. BITTER:  Catholic University of America.
14              THE COURT:  In Washington?
15              MR. BITTER:  In Washington, DC, yes, sir.
16              THE COURT:  Well, at least you weren't tainted with
17   seven years.  About three years of law school pretty much
18   crippled me.  I had to go to the University of Virginia to
19   get a master's to fix the defects in my education.
20              So, the claim is that somebody with
21   Sam Houston told the University of Houston to discriminate
22   against her.  Is that right?  Is that your --
23              MR. BITTER:  I mean, I don't want to just claim.  I
24   think that's how we interpret it --
25              THE COURT:  I asked you.  If you don't want to do
```

1    it, then tell me, 'I'm not answering your question.'

2              MR. BITTER:  No.  We interpret their claim is that

3    the University of Houston knew about her protected activity

4    and denied -- or I should say failed to offer her a position

16:31  5    based on that protected activity, and we denied both --

6              THE COURT:  Part of her claim was that they knew

7    about it because Sam Houston calls Houston and told -- Did

8    Houston call Sam Houston?

9              MR. BITTER:  Houston called Sam Houston as part of

16:31  10   the check of her current position, the supervisor of her

11   current position.

12             THE COURT:  You know, that's a legitimate activity

13   by the University of Houston.

14             MR. ROBINSON:  To check tenure?

16:31  15             THE COURT:  To check references.  It is privileged

16   from the claim about slander or libel because it's a topic

17   that both Sam Houston and the University of Houston have a

18   legitimate interest in, and there is nothing nefarious about

19   that.  In fact, the problem today with the nature of

16:32  20   people's complaints is that lots of companies won't give the

21   information.  They'll fire somebody for embezzlement and

22   they'll just say he worked here from year to year, which

23   it's -- I mean, somebody who's honest doesn't get that job

24   and then the company discovers he wasn't honest there

16:32  25   because he's not being honest here.

1          All right.  Anything else the University of

2     Houston did besides deny her tenure on sexist grounds?

3          MR. ROBINSON:  Denied her employment based on the

4     protected activity she engaged in while she was --

16:33  5          THE COURT:  Mmm-hmm.

6          MR. ROBINSON:  She informed them in the application

7     process that she had engaged in that protected activity at

8     Sam Houston State.

9          THE COURT:  Activity didn't give her a job.  There

16:33  10    are people who show up for their first day of work and in

11    the first week or two go to human resources and tell them,

12    you know, 'I am really concerned about the opportunities of

13    all the white men here,' or something and then use that

14    every time they get criticized.  'You're just getting back

16:33  15    at me for doing that.'

16              She's free to make her complaints, but she has

17    to prove -- She is committing the fallacy of post hoc.

18              You speak Latin, don't you?

19          MS. BANERJEE:  I'm sorry?

16:33  20          THE COURT:  You speak Latin, don't you?

21          MS. BANERJEE:  A little.

22          THE COURT:  That means "after this because of

23    this".

24              And that she told the University of Houston

16:34  25    she had complained about discrimination somewhere else may

1    not even be a necessary condition, because it has to be

2    made, I think, to the decisionmaker about, you know, the

3    complaint.  I don't know about that one.  But it's certainly

4    not a sufficient condition because, had she not complained,

16:34   5    she wouldn't have any claim against Sam Houston State.

6            MR. ROBINSON:  Well, she --

7            THE COURT:  She would have no complaint in law.

8    But she did complain; so, she can sue.  She doesn't win

9    based on that simple sequence of events.  She needs to still

16:34   10   put the proof that it was because of it.  And marshaling a

11   bunch of office gossip, like this stipulation or

12   non-stipulation, is not the stuff of proving a denial of

13   equal opportunity.  You have to have something -- an

14   operative substantial.

16:35   15           As near as I can tell, her only complaint here

16   is likely she was paid less but that she didn't get tenure.

17           I have never thought about it, but I have had

18   more tenure decisions than you can imagine working here.

19   You wouldn't think professors were litigious, but apparently

16:35   20   they are.  And some of them are based just on decisions

21   arbitrary where somebody believes there was no statutory

22   ground; they were just unfairly treated.

23           Has she gotten interviews anywhere else?

24           MR. ROBINSON:  I do not believe she as.

16:36   25           THE COURT:  Have you looked at other place she's

1    applied?

2           MR. BITTER:  We have not, Your Honor.  We do at

3    least know, obviously, with respect to the University of

4    Houston.

16:36    5           THE COURT:  Well, I'm not talking about that.  How

6    did you give it to them?  On a sheet of paper or in a

7    narrative?  In a list?

8           MR. ROBINSON:  On paper.  The list of places she's

9    applied, yes, is on paper.

16:36    10           THE COURT:  Do you have it?

11           MR. ROBINSON:  I do not have the paper here.

12           THE COURT:  Well, do you have it on your computer?

13           MR. BITTER:  I have the paper if you need it, Your

14    Honor.

16:36    15           THE COURT:  What was her last day --

16           MR. BITTER:  That's the cover page of the

17    transmittal and then I believe the specific request is later

18    on.  Yeah, we may have double-sided....  I believe it's

19    Section F is the exact request.

16:37    20           THE COURT:  Your calculation of lost income -- I

21    don't know who did this for you, but they're not much of an

22    economist.  They also didn't take out the fact she's not

23    able to work on here.

24           MR. ROBINSON:  I'm sorry?

16:37    25           THE COURT:  She's not having to work.  That's a

1    savings.  She doesn't have to go and park and put up with a

2    bunch of graduate students.  That's why it's called "work".

3              So, she doesn't get paid for not having

4    worked, expects some real lost income, transitional income.

16:38   5    36 years?  She's going to retire and she's going to get a

6    half a million dollars a year 36 years from now?

7                   How old is she?

8              MR. BITTER:  I'm not sure.

9              MR. ROBINSON:  I'm not sure.

16:38   10             THE COURT:  Does she have gray hair?

11             MR. BITTER:  No, Your Honor.

12             MR. ROBINSON:  She --

13             THE COURT:  She's young.

14             MR. ROBINSON:  Well, to me.

16:38   15             THE COURT:  You're young to me.

16             MS. BANERJEE:  Your Honor, she was born in 1976.

17             THE COURT:  When?

18             MS. BANERJEE:  1976.

19             THE COURT:  39?  That's easy, because my younger

16:38   20   daughter was born in 1948.  So, I know how old she and I

21   just subtract any single-digit number from Lindsey's age.

22             Now, she's not suggesting that the University

23   of Houston or Sam Houston has any influence over the City

24   University of New York, John Jay College, University of

16:39   25   Dallas, Dushane in Pittsburgh, University of Texas,

1   St. Thomas, Texas Southern.  Okay.  Does she think that was

2   based on her race?

3           MR. ROBINSON:  She's not suggesting that.  The

4   question of fact is who she applied to.  She's just stating

16:40   5   where she applied.

6           THE COURT:  I may have missed a couple of them.

7   Oh.  Rice.

8               Does she have the applications for all these

9   places?

16:40   10          MR. ROBINSON:  I don't know if they require

11  applications.

12          THE COURT:  It was just online?

13          MR. ROBINSON:  I don't know the answer to that.

14          THE COURT:  Well, find that out.

16:40   15              I had a guy who worked for a place called the

16  State of Texas once and he thought they treated him poorly.

17  And, so, after they let him go, he would apply to every open

18  position on the State of Texas website.  So, he said, "I

19  have applied to 187,000 jobs."  Now I know why they let him

16:41   20  go.

21              So, get what the process was for each.  And I

22  don't know the correlation between the solicitations and her

23  qualifications.

24          MR. ROBINSON:  I don't understand the question.

16:41   25  I'm sorry.

1          THE COURT:  Well, we have some City of Houston

2     workers who got a doctorate in civil engineering from a post

3     office box in Louisiana and they applied for being public

4     works directors and all kinds of high-level, sophisticated

16:42  5     technical jobs claiming they had a doctorate and the other

6     guys don't.  I guess it's a hobby.

7          MR. ROBINSON:  I think she's overqualified for most

8     of these positions.

9          THE COURT:  And do you know who these three people

16:42  10    were that were hired at the University of Houston and she

11    wasn't?

12         MR. ROBINSON:  Yes.

13         THE COURT:  Do you know?

14         MR. BITTER:  The names?  Yes, Your Honor.

16:42  15         THE COURT:  Do you know their qualifications?

16         MR. BITTER:  Yes, Your Honor.

17         THE COURT:  And have Miss Bloom do a chart of her

18    qualifications and these three people's qualifications.  If

19    you have a hundred Nobel laureates in physics one of them is

16:43  20    at least going to be qualified.

21         MR. BITTER:  With our disclosure we just put up the

22    resumes of those three individuals and we can certainly do a

23    chart as well.

24         THE COURT:  I want you to distinguish a little bit.

16:43  25    If you confuse me -- which is highly likely -- then I will

1    read the resumes.

2              [Hands documents back to counsel]  I'm afraid

3    I may have mixed up....

4              MR. BITTER:  That's all right.  They're

16:43   5    double-sided.

6              THE COURT:  They may not be in order, but all the

7    holes line up.

8              MR. BITTER:  Thank you, Your Honor.

9              THE COURT:  All right.  Anything else you can think

16:43   10   of you need?

11             MR. ROBINSON:  Well, Your Honor, we actually

12   provided a list to opposing counsel in both cases of all the

13   things we talked about.

14             THE COURT:  Well, that's fairly good.  I have got

16:44   15   people waiting for me.  We're not going to do anything about

16   these people until we find out what the qualifications of

17   the successful people are.

18             MR. ROBINSON:  The first section of this document

19   on each of them is what we're talking about in terms of

16:44   20   documentation.

21             THE COURT:  Are the personnel files and processes

22   for downtown coordinated with the main campus or is that a

23   separate decision-maker's reading?

24             MR. BITTER:  In terms of the personnel decisions?

16:45   25             THE COURT:  Uh-huh.

1          MR. BITTER:  The only thing that has to go to

2     System for hiring is very high-level positions --

3     chancellor-level, that type of thing.

4          THE COURT:  We don't care about the fall of 2007.

16:45    5     That's way outside of limitations.

6          MR. ROBINSON:  I would like to agree with the Court

7     on that.  In terms of her evaluations --

8          THE COURT:  I have three hundred --

9          MR. ROBINSON:  Some reasonable time frame.

16:46   10          THE COURT:  -- 380 statutory limit from her first

11     complaint.

12          MR. ROBINSON:  Right.  Well, I guess, if they were

13     going to say that her performance was poor at some point....

14          THE COURT:  If they identify something outside of

16:46   15     the limitations period that colored their decision eight

16     years later, then they will have to document it.  You know,

17     lots of people have sterling reviews.  Then they get fired,

18     but it's because they took to drinking or something.  People

19     change or their work changed.  You can be really good at

16:46   20     something.

21               I don't think we need to psycho-analyze

22     Hebert's notes.  She says everything he said was on her

23     side.  Why would she need to see the notes?

24          MR. ROBINSON:  Full disclosure.

16:47   25          THE COURT:  There's got to be a purpose to it.

```
 1   They got --
 2          MR. ROBINSON:  I'm not really sure if it's of that
 3   process.
 4          THE COURT:  He was the guy she complained to.  She
 5   quoted him.  Where did she get her quotes?
 6          MR. ROBINSON:  From conversations.
 7          THE COURT:  Well....  Is she not saying what she
 8   said he said is true?
 9          MR. ROBINSON:  Well, if he sent communications
10   after the fact --
11          THE COURT:  Well, this is way too argumentative.
12          MR. BITTER:  We also believe that the scope of the
13   proposed depositions are -- we believe they're extensive.
14          THE COURT:  Yes.  I already said that, didn't I?
15          All right.  No depositions until we get
16   straight --
17          MR. ROBINSON:  Your Honor, some of these things
18   were part of your order for disclosure and --
19          THE COURT:  But the performance evaluations of her
20   should have been produced.
21          MR. BITTER:  Yes, Your Honor.
22          THE COURT:  That's No. 5 on here or No. 4.  I can't
23   tell.  There's so many acronyms, but that's not your fault.
24          This No. 2, where there is about 12 people and
25   then men were hired, were they all hired in 2011, '12, '13?
```

16:47, 16:47, 16:47, 16:48, 16:48

1          MR. BITTER:  I do not believe so.

2          THE COURT:  So, I have got no idea why all these

3     people are relevant.

4          MR. ROBINSON:  These are the comparators in

16:48   5     Sam Houston in terms of treatment --

6          THE COURT:  No.  Wait.  You're asking for males.

7     We want everybody.  She can't exclude other women who did

8     better than she did.  I already told you --

9          MR. ROBINSON:  There's only, I think, her for the

16:49  10     most part.  She's the only female.

11          THE COURT:  Well, I don't know that.  And that

12     alone shows they're open to women or they wouldn't have her.

13               All right.  Can I keep this?

14          MR. ROBINSON:  Yes, Your Honor.

16:49  15          THE COURT:  I'll probably lose it; so, don't come

16     without an extra copy next time.

17               All right.  Get the tenure track pool and

18     their objective qualifications.  And I'm not saying the

19     University can't give somebody tenure six weeks after they

16:49  20     got their Ph.D., but they ought to be able to give a

21     rational reason for doing it.  I don't want the reason now.

22     I just want the hard data, their ages when they got their

23     three degrees or seven degrees or whatever it is.  I think

24     somebody like me that has an extra degree -- I ought to be

16:50  25     able to rent it to somebody that doesn't have a degree.

```
 1              All right.  How long will it take you to get
 2   this done?
 3         MR. BITTER:  Umm --
 4         THE COURT:  Ten days.  That's good.
 5              You, too.
 6              And then we'll get back together in about -- I
 7   don't know, but you will get an order.  But don't dilly
 8   daddle.  We have this case -- Can we consolidate them or do
 9   we need to keep them separate?
10         MR. ROBINSON:  Your Honor, I think they should be
11   separate.
12         THE COURT:  It's all the same facts.  One episode
13   where Sam Houston State polluted the waters with the
14   University of Houston.
15         MR. ROBINSON:  Well, honestly, I think they would
16   probably object more than we could.
17         MR. BITTER:  Yeah.  I think there really is sort of
18   a -- as I see it, sort of a stop in the set of facts once
19   she applied to University of Houston.  I see them as
20   somewhat different.
21         THE COURT:  All right.  I will get credit for
22   closings two cases when I crush you.
23         MR. ROBINSON:  Your Honor --
24         THE COURT:  How will that look on your record?
25         MR. ROBINSON:  Your Honor, one more thing.
```

                1        THE COURT:  Yes, sir.

                2        MR. ROBINSON:  I already sent this in, but I just

                3   wanted to be clear, that I am going out of the country from

                4   February 15th until March 4th.

16:51           5        THE COURT:  Is she going with you?

                6        MR. ROBINSON:  No.  My wife.  I am afraid not.

                7        THE COURT:  Well, you're doing something wrong,

                8   then.  Why can't she do it?

                9              Are you a lawyer?

16:52          10        MS. BANERJEE:  Yes.

               11        MR. ROBINSON:  She is.

               12        THE COURT:  She has advantages.  She's young.

               13   She's freshly educated, hasn't picked up any bad habits yet.

               14   She can do it.  If she can't, she can scream for help.

16:52          15        MR. ROBINSON:  I am just referring to appearing.

               16        THE COURT:  She can appear.  But if you have a

               17   vacation letter someplace, you've got to tell me.  You have

               18   got to move for a continuance in my case.

               19        MR. ROBINSON:  I actually filed a notice of

16:52          20   vacation.

               21        THE COURT:  I know, but -- And I might bore you and

               22   we're going to set whatever we need to do while you're off

               23   galavanting around the world and she and I are standing here

               24   in a bleak, cold concrete city.  But we'll think kind

16:53          25   thoughts of you.

1          Where are you going?

2          MR. ROBINSON:  I am going to Thailand, Vietnam and

3     Cambodia.

4          THE COURT:  She can handle it.  If not, I will cut

16:53     5     her some slack.  I am going to cut you some slack.

6               So, I will set something somewhere around a

7     month or however -- but y'all get the stuff exchanged in ten

8     days.

9          MR. BITTER:  Would you like the information filed

16:53     10    with the Court or just --

11         THE COURT:  Please.  Bring anything that -- like

12    the charts.  I like charts --

13         MR. BITTER:  Yes, Your Honor.

14         THE COURT:  -- charts and graphs.  If I can think

16:53     15    of a reason for you to give me a map -- I like maps, too.

16

17              COURT REPORTER'S CERTIFICATE

18         I, BRUCE SLAVIN, certify that the foregoing is a

19    correct transcript from the record of proceedings in the

20    above entitled matter, to the best of my ability.

21

22                        *s/Bruce Slavin*
                         BRUCE SLAVIN, RPR, CMR
23

24

25