UNITED STATES DISTRICT COURT　　　　　　　SOUTHERN DISTRICT OF TEXAS

United States District Court
Southern District of Texas

**ENTERED**
September 30, 2019
David J. Bradley, Clerk

| | | |
|---|---|---|
| Audrey Miller, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action H-15-2824 |
| | § | |
| Sam Houston State University, | § | |
| Defendant. | § | |

## Opinion on Summary Judgment

### 1. Introduction

A university denied tenure to a female professor. The professor filed a discrimination charge with the Equal Employment Opportunity Commission and initiated an internal grievance proceeding with the university. The university did not renew her employment contract.

The professor sued under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and the Equal Pay Act of 1963, 29 U.S.C. §206(d). The university moved for summary judgment, and the professor responded. The motion for summary judgment will be granted.

### 2. Facts

Plaintiff Audrey Miller (Miller) began working at Sam Houston State University (SHSU) in August 2007 as a tenure-track Assistant Professor in the Clinical Doctoral Program (Clindoc Program) in the Department of Psychology and Philosophy. The Clindoc Program required doctoral students to complete at least seven semesters of hands-on practicum training with live clients and a year-long pre-doctoral internship. Miller, along with approximately ten core faculty members of the Clindoc Program, was assigned to supervise students

1

working with live clients. The Director of Clinical Teaching, Mary Alice Conroy (Conroy), was responsible for assigning students to practice sites.

In 2010, Miller approached Conroy with data she had compiled on the division of student supervision workload among the Clindoc Program faculty. Miller complained about her workload. Conroy responded that faculty members were expected to redistribute the workload among themselves if necessary. (*See* 70-2 at 26–27) Miller also approached Department Chair Chris Wilson (Chair Wilson) about the issue. Chair Wilson did not furnish Miller with relief.

Leading up to her tenure review, in several instances Miller was advised to recuse herself or was removed from faculty oversight committees. For example, in May 2012, Miller raised a concern that a student's dissertation draft was not ready for defense due to a defect in a core hypothesis. (*See* 84-13) Again in January 2013, Miller objected to a student's proposal to change procedures relating to the security of forensic psychological reports. (*See* 85-9) In each case, Miller's opinions were met by other faculty members' disagreement, including those who were senior to her. (*See* 84-16)

Two faculty committees, Department Promotion and Tenure Advisory Committee (Department Advisory Committee) and College of Humanities and Social Sciences Dean's Advisory Committee on Promotion and Tenure (Dean's Advisory Committee), recommended tenure decisions for faculty members in the Clindoc Program. (*See* 70-7 at 3–6) Rody Miller (R. Miller) chaired both committees.

On February 18, 2012, and May 2, 2012, R. Miller sent letters to both Dean John de Castro (Dean de Castro) and Chair Wilson summarizing the Department Advisory Committee's review of Miller's work in 2011. (70-17 at 8–9, 75-8 at 3–4) The February 2012 letter stated that Miller's behavior "has eroded her colleagues' willingness to rely on her" and that her actions have been "disadvantageous to students." (70-17 at 8.) The letter cited an instance where she was removed from a dissertation committee due to "disruption[] of student

2

mentoring and training." (*Id.*) The May 2012 letter reported that Miller "lack[s] in collaborative and attentive generosity," that she is "egocentric" in using communal resources, and that she counts her contribution to supervising student work as "overloads." (75-8 at 3–4.) Miller responded by sending an e-mail to the Department Advisory Committee faculty members, voicing her objections to the letter and requesting guidance on how she can meet the committee's expectations. (82-12) She also met with R. Miller to discuss the impact of the letter on her tenure application. (*See* 80-14)

Miller submitted her application for promotion to Associate Professor with tenure for external review on October 22, 2012, and for internal review on January 3, 2013. (33 at 2) At that time, the Department of Psychology had nineteen tenure-track psychology faculty, including thirteen males and six females. (74-1 at 10)

On February 5, 2013, R. Miller sent a third letter to Chair Wilson, outlining the Department Advisory Committee's concerns that Miller's collegiality had not improved. (70-17) The letter stated that Miller exhibited "obstinacy and inflexibility" that impeded student research, "thin-skinned spitefulness" directed to students, and "disrespect for her colleagues' expertise, and defensive disregard of their advice." (70-17 at 2) As examples of Miller's behavior, R. Miller stated that on four occasions, Miller's actions caused problems with students, including a risk of delay or an actual delay in a student's dissertation defense. (*Id.* at 2–3) R. Miller also wrote that other Clindoc Program faculty members had expressed their unwillingness to work with Miller. (*Id.* at 3)

On March 27, 2013, SHSU's Provost and Vice President for Academic Affairs Jaimie Hebert ("Provost Hebert") sent Miller a letter stating that her tenure application had been denied. (70-17 at 12) Miller filed a complaint with the EEOC and the Texas Workforce Commission ("TWC") on May 20, 2013. (70-19) On or around July 12, 2013, SHSU denied Miller a merit increase in salary for the year 2013–14. (87-19) Her employment with SHSU expired on May 31, 2014. (33 at 3) She filed this lawsuit on September 28, 2015. (1)

3

3. *Summary Judgment*

   A. *Legal standard*

Summary judgment is proper when, viewing the evidence in the light most favorable to the non-movant, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see* Fed. R. Civ. P. 56(a). A dispute about a material fact is "genuine" if the evidence would allow a reasonable jury to find in favor of the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

If the movant meets its burden and points out an absence of evidence on an essential element of the non-movant's case, on which the non-movant bears the burden of proof at trial, the non-movant must then present competent summary judgment evidence to support the essential elements of her claim and demonstrate that there is a genuine issue of material fact for trial. *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d 698, 712 (5th Cir. 1994). The non-movant may not rely merely on allegations, denials in a pleading, or unsubstantiated assertions that a fact issue exists, but she must offer specific facts showing the existence of a genuine issue of material fact concerning every element of her causes of action. *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998); *see Brandon v. Sage Corp.*, 808 F.3d 266, 270 (5th Cir. 2015) (requiring more than "metaphysical doubts as to the material facts").

Conclusory allegations unsupported by evidence cannot overcome summary judgment. *National Ass'n of Gov't Employees*, 40 F.3d at 713; *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Liberty Lobby*, 477 U.S. at 247–48 (emphasis original); *see State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990). "Nor is the 'mere scintilla of evidence' sufficient; 'there must be evidence

4

on which the jury could reasonably find for the plaintiff.'" *Liberty Lobby*, 477 U.S. at 252. The Fifth Circuit requires the non-movant to submit "significant probative evidence." *Gutterman*, 896 F.2d at 118. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Thomas v. Barton Lodge II, Ltd.*, 174 F.3d 636, 644 (5th Cir. 1999) (citing *Liberty Lobby*, 477 U.S. at 249–50).

B. *Deficiencies in Miller's summary judgment evidence*

To show that there is a genuine fact dispute, the party must cite to "particular" parts of the record that contain admissible evidence. *See* Fed. R. Civ. P. 56(c). It is unreasonable to expect the court to "wade through the record in an effort to sift out a material factual dispute." *See Phillips Med. Capital, LLC v. P&L Contracting, Inc.*, No. 2:10CV92-DAS, 2011 WL 13217913, at *2 (N.D. Miss. Nov. 21, 2011).

Miller's response is 246 pages long and refers to a 128-page declaration, along with more than 250 exhibits. (*See* 74–89) Despite its length, much of Miller's response relies on unsubstantiated assertions that the court cannot consider. *See Morris*, 144 F.3d at 380. Her declaration is full of speculative accusations, irrelevancies, and hearsay. She has incorporated thousands of pages of documents by reference. It would take months for the court to rule on every single evidentiary problem in Miller's response and summary judgment evidence. For this reason alone, the court finds that Miller has failed to demonstrate the existence of a factual dispute.

That being said, the court has endeavored to find and consider the evidence that is most favorable to Miller's case. The court still finds that Miller has not shown the existence of a genuine issue of material fact.

4. *Title VII*

The law makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

### A. *Gender discrimination claim*

Miller asks the court to determine whether circumstantial evidence supports her claims of unlawful gender discrimination. The law furnishes a process. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Miller must first establish a prima facie case of sex discrimination. Then, the burden shifts to SHSU, which must produce a legitimate, non-discriminatory reason for its actions. SHSU is not required to convince the court that it was actually motivated by this reason, it only must raise a genuine fact issue on whether or not it discriminated against Miller. Next, Miller must supply the court with evidence that SHSU's stated reason is mere pretext – a cover-up for its discriminatory acts.

A prima facie case of discrimination requires a showing that the plaintiff is a member of a protected group; she was qualified for the position at issue; she was discharged or suffered some adverse employment action by the employer; and she was treated less favorably than other similarly situated employees outside the protected group. *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007).

Although Miller raises multiple claims of gender discrimination, only the denial of tenure and denial of a salary increase constitute "adverse employment actions." *See McCoy*, 492 F.3d at 559 ("[A]dverse employment actions include only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating."). Distribution of workload, course releases, and removal from dissertation committees are not adverse employment actions within the meaning of Title VII. *See id.* Thus, Miller has not shown a prima facie case of discrimination as to those claims, and the university's motion for summary judgment is granted.

Assuming Miller can show a prima facie case of discrimination as to her denial of tenure and denial of merit-based salary increase, she has not shown that SHSU's legitimate, non-discriminatory reasons are mere pretext for gender discrimination. A plaintiff must offer "sufficient evidence" for a factfinder to find that the employer's reason was pretext.

*See Evans v. City of Bishop*, 238 F.3d 586, 591 (5th Cir. 2000) (citing *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147–48 (2000)).

SHSU's documented reasons for denying Miller tenure was that she lacked collegiality. Letters generated during the tenure review process stated that Miller's "[lack of] collaborative and attentive generosity," "obstinacy and inflexibility," "thin-skinned spitefulness," and "disrespect for her colleagues" harmed student research and dissuaded her colleagues from collaborating with her. (*See* 70-17, 75-8 at 3–4) The letters also stated Miller did not show signs of improvement. (*See* 70-17, 75-8 at 3–4) Courts have recognized that an employee's inability to get along with colleagues may constitute a legitimate, non-discriminatory reason for adverse employment action. *See, e.g., Gee v. Principi*, 289 F.3d 342, 348 (5th Cir. 2002); *Burns v. Check Point Software Techs., Inc.*, No. 3:01-CV-1906-P, 2002 WL 31455598, at *13 (N.D. Tex. Oct. 31, 2002).

To show pretext on a disparate treatment theory, the plaintiff must demonstrate that she was treated more harshly than other "similarly situated" employees for "nearly identical" conduct. *See Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009). While "nearly identical" is not synonymous with "identical," the comparator employee must have "essentially comparable violation histories." *See Harville v. City of Houston, Mississippi*, No. 18-60117, 2019 WL 3851738, at *3 (5th Cir. Aug. 16, 2019). The comparator employees must also have "held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person." *Id.*

Here, no one else was cited for lacking collegiality. The record lacks any evidence that any male comparator caused his colleagues to refrain from collaborating with them. No evidence suggests that a male comparator refused to accommodate others' academic opinions when the circumstances allowed for reasonable debate, especially in dealing with student research supervision.

Miller argues that male faculty routinely criticized, delayed, and terminated student research projects without any repercussions. She

7

argues that Associate Director of Clinical Teaching Marcus Boccaccini complained about supervising "subpar" student work, but no one criticized him. (*See* 84-8) He was, however, not similarly situated to Miller because he was a tenured faculty member who was senior to Miller, holding the position of Associate Director of Clinical Teaching. Miller also argues that R. Miller criticized a student's dissertation draft without facing the criticism that she faced, but she did not show that R. Miller was similarly situated to her. (*See* 84-9) R. Miller was a tenured professor many years senior to Miller. Miller also has not shown that R. Miller or Boccaccini engaged in conduct "nearly identical" to hers. There is no indication that R. Miller or Boccaccini caused difficulties to other faculty or that other faculty did not want to work with them.

In further effort to show pretext, Miller cites to positive teaching evaluations, complimentary e-mail correspondence from students, and the nominations she received from students for various awards and recognitions. She argues that these positive student views show that SHSU's concerns about her obstruction of student research were false. (*See, e.g.*, 75-6, 75-7, 76-2) Students do not know about Miller's interactions with other faculty members. Students do not make decisions at the university. Reading the record in the light most favorable to Miller, some students' favorable opinions of her do not create a material fact issue as to whether her actions in dealing with other students created tensions in the Clindoc Program. It may be true that some students liked her, but Miller's evidence does not address the core issue, which is her disruption of student work and her inability to get along with other faculty members.

Miller argues she can show that SHSU administrators admitted their criticism of her as lacking collegiality was pretext. Miller asserts that

- on July 30, 2012, in a meeting with Miller, Dean de Castro stated that "faculty are smart – if they don't like something about you, they'll get you on something else-like teaching, research, or service" (82-17 at 2);

8

- on August 3, 2012, Provost Hebert met with Miller about her grievance and discussed the tenure committee letter dated May 2, 2012, and he commented that some observations in the letter were *subjective*, that Conroy appears to have taken control of the tenure committee meeting, and that there *could have been* a "mob effect" (82-19 at 31–32, 41);
- on August 27, 2012, R. Miller told Miller that the word "collegiality" is an "easy label" that addresses the concerns raised by committee members (80-14 at 5); and
- on April 10, 2014, the faculty senate discussed the potential for abuse by having collegiality as a separate criterion for tenure review, which included concerns that it would allow for discrimination against minorities. (See 82-10 at 2–4)

Contrary to Miller's argument, these statements do not negate the veracity of SHSU's position that faculty members were reluctant to collaborate with Miller. Also, none of the evidence shows that the true reasons for denial of tenure and merit increase were discriminatory. To the extent that Provost Hebert and Dean de Castro's remarks contain any criticism of the process leading to Miller's denial of tenure, those remarks do not raise a doubt as to the veracity of SHSU's nondiscriminatory reason for denying her tenure.

Miller also alleges that SHSU discriminated against other female faculty and staff. Miller is not suing for those other female employees, and they were not similarly situated to her. *See Wyvill v. United Co. Life Ins. Co.*, 212 F.3d 296, 302 (5th Cir. 2000) (pretext may be established by anecdotal evidence of discrimination against other employees only if they were similarly situated to the plaintiff); *see also Jackson v. Univ. of Texas M.D. Anderson Cancer Ctr.*, 172 F. Supp. 2d 860, 878 (S.D. Tex. 2001), *aff'd*, 54 F. App'x 404 (5th Cir. 2002) (finding that another employee's experience was "not probative of the plaintiff's own race discrimination claims" because that employee was not similarly situated with the plaintiff).

Miller suggests that Lydia Cruz Fox, Holly Miller, Diane Stoebner-May, Diana Buccafurni-Huber, Bernice Strauss, and Julie Hall experienced gender discrimination at SHSU. Miller cannot show that any of these women were similarly situated to her. Miller was a tenure-track

9

faculty member of the Clindoc Program within the Psychology Department. Neither Fox nor Stoebner-May was a tenure-track professor. (*See* 74-1 at 25, 28) Strauss was an "untenured staff member in the SHSU Counseling Center." (*See* 74-1 at 27) Holly Miller was no longer employed with the Psychology Department when plaintiff started her employment. (78-4) Buccafurni-Huber was employed in the Philosophy Department. (74-1 at 14) Hall is a tenured professor in the English Department. (78-3) None were similarly situated to Miller.

Miller has not established a genuine issue of material fact as to SHSU's discriminatory intent. SHSU's motion for summary judgment is granted.

### B. *Retaliation*

Title VII prohibits retaliation against persons who assert rights under the statute. 42 U.S.C. § 2000e–3(a); *see Rios v. Rossotti*, 252 F.3d 375, 380 (5th Cir. 2001).

A plaintiff relying on circumstantial evidence must first state a prima facie case of retaliation. The prima facie case requires a showing that the plaintiff "participated in an activity protected by Title VII"; her "employer took an adverse employment action against [her]"; and "a causal connection exists between the protected activity and the adverse employment action." *McCoy*, 492 F.3d at 556–57 (5th Cir. 2007). Once the plaintiff demonstrates a prima facie case, an inference of retaliation is created, and the employer must produce a legitimate, non-discriminatory reason for taking the adverse employment action. *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 408 (5th Cir. 1999). After the employer meets its burden, the plaintiff must show that but for the alleged wrongful action of the employer, the unlawful retaliation would not have occurred. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) (holding that "Title VII retaliation claims must be proved according to traditional principles of but-for causation"); *Septimus v. Univ. of Houston*, 399 F.3d 601, 608 (5th Cir. 2005); *see Marlow v. McClatchy Bros.*, No. CV H-15-2417, 2016 WL 4702586, at *2 (S.D. Tex. Sept. 8, 2016) (Rosenthal, C.J.).

Miller argues that she has made out a prima facie case of retaliation because she engaged in two protected activities that were met with three adverse employment actions. She claims that she opposed discriminatory practices at SHSU and subsequently filed an EEOC complaint. She argues that because of those protected activities, SHSU retaliated against her by denying her tenure, not granting her a merit-based pay increase in the year following the tenure denial, and giving her a negative reference to a prospective employer.

*1) Miller's objections to SHSU's affidavits*

As a preliminary matter, the court denies Miller's motions to strike the declarations of university administrators. (73, 101) The administrators state that they lacked knowledge of her gender discrimination claims prior to denying her tenure. Miller argues that the statements are conclusory and not admissible.

Miller's objections are overruled. Each declarant made the challenged statements based on their personal knowledge under penalty of perjury. (*See* 70-4, 70-5, 70-6, 70-7) Thus, the declarations are proper summary judgment evidence. *See* Fed. R. Civ. P. 56(c)(4); *see also Lohn v. Morgan Stanley DW, Inc.*, 652 F. Supp. 2d 812, 825 (S.D. Tex. 2009) (overruling objection to information within the declarant's personal knowledge). The declarations are not legal conclusions. The declarants stated their own lack of knowledge about her participation in protected activity.

*2) Protected activity*

Miller argues that she participated in two protected activities. She argues she complained to Conroy and Chair Wilson about her relative share of clinical supervision work and she filed an EEOC complaint against SHSU.

Miller's filing of the EEOC complaint is a protected activity. It is unclear whether Miller's complaint about workload was a protected activity. An employee participates in protected activity when she opposes "any practice made an unlawful employment practice by Title VII" or makes "a charge, testifie[s], assis[s], or participate[s] in any

11

manner in an investigation, proceeding, or hearing under Title VII." *Douglas v. DynMcDermott Petroleum Operations Co.*, 144 F.3d 364, 372 (5th Cir. 1998) (internal citations and quotation marks omitted). The opposition prong ordinarily requires a showing that the employee "communicate[d] to her employer a belief that the employer has engaged in [an actionable] form of employment discrimination." *See Crawford v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, 555 U.S. 271, 276 (2009) (internal quotation marks omitted). Miller admits that when she approached Conroy, she did not allege gender discrimination. (74-1 at 36) Conroy and other university administrators stated under penalty of perjury that they were not aware of any gender discrimination claim brought by Miller when they denied her tenure. (*See* 70-4 at 3, 70-5 at 3, 70-6 at 5, 70-7 at 2) Miller insists that during her meeting with Conroy on May 28, 2010, she asked "why [she was] expected to do more than twice the work of male Clindoc faculty members." (70-2 at 23)

Even if her complaint to administrators is considered a protected activity, her retaliation claim still lacks merit for these reasons.

### 3) Tenure denial

Miller cannot establish a causal nexus between the EEOC complaint and the tenure denial. To meet the causation element at the prima facie stage, an employee must show that "the employer knew about the employee's protected activity." *Manning v. Chevron Chem. Co.*, 332 F.3d 874, 883 (5th Cir. 2003). SHSU denied her tenure in March 2013. (70-17 at 12) Miller filed a complaint with the EEOC and the TWC on May 20, 2013, two months after the tenure denial. (70-19) No reasonable factfinder can conclude that SHSU denied her tenure for filing a complaint with the EEOC.

To the extent that Miller can show a prima facie case of retaliation based on her complaint about unequal work distribution, Miller has not shown that she would not have been denied tenure but for SHSU's retaliatory motive. Her complaints about the workload were one of many reasons that SHSU considered her to be lacking in collegiality. (*See* 70-17, 75-8 at 3–4 (citing Miller for "obstinacy and inflexibility," "thin-

skinned spitefulness," and "disrespect for her colleagues").) As discussed above, she has not shown that SHSU's reasons for denying her tenure were pretext to a discriminatory motive. Thus, Miller's argument does not survive summary judgment.

### 4) Negative reference

Miller also argues that SHSU retaliated against her by giving a false, negative reference to the University of Houston – Downtown (UH) after she left SHSU. She applied for a faculty position there after SHSU denied her tenure. Although a former employee may bring a retaliation claim against a former employer for giving a negative reference, *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997); *Brazoria Cty., Tex. v. E.E.O.C.*, 391 F.3d 685, 696–97 (5th Cir. 2004), the employee must still meet her burden to demonstrate a prima facie case of retaliation. Miller has not met that burden.

As she admitted at her deposition, Miller has no direct proof that SHSU gave a negative reference about her to UH. (*See* 70-2 at 11, 70-3 at 20–25.) She instead relies on circumstantial evidence: (a) she was among the shortlisted candidates for the position at UH; (b) a telephone call between an administrator at UH and Chair Wilson; and (c) her removal from the shortlist after that phone call. (74-2 at 38)

Even if Miller can establish that SHSU gave UH a negative reference about her, she cannot satisfy the causal nexus element required to show a prima facie case of retaliation. At the prima facie stage, the plaintiff must set forth "at least *some* evidence of a causal link between the protected activity and the adverse employment action to establish a prima facie case of retaliation." *Ackel v. Nat'l Communications, Inc.*, 339 F.3d 376, 385–86 (5th Cir. 2003) (emphasis original). Temporal proximity between the protected activity and adverse action may create an inference of causation at the prima facie stage, but the gap between the activities must be "very close." *See Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) (per curiam). In this case, at least ten months had lapsed between May 2013, when Miller filed the EEOC complaint, and April 2014, when SHSU allegedly gave a negative reference to UH.

13

That gap is too long to establish a causal nexus on its own. *See, e.g., Ganheart v. Brown*, 740 F. App'x 386, 391 (5th Cir. 2018)("[A] five-month interval between a protected activity and an adverse employment consequence is too long to sustain a prima facie claim of causation based solely on temporal proximity."); *see also Hutto v. Univ. of Houston Sys.*, No. CIV.A. V-05-70, 2008 WL 4453427, at *7 (S.D. Tex. Sept. 28, 2008)(collecting cases).

The record is otherwise devoid of any evidence that Miller's participation in protected activity triggered SHSU to give the alleged negative reference to UH. Chair Wilson had already formed his opinion that Miller lacked collegiality before she filed the EEOC complaint. (*See* 70-17 at 5–7.) Miller offers no evidence that but for the retaliatory motive, Chair Wilson would not have given UH a negative reference about her.

In sum, she has sued on what she has imagined happened between the schools.

### 5) Denial of a pay raise

Miller has not shown a prima facie case of retaliation based on SHSU's denial of a merit-based pay increase during the last year of her employment. Denial of a pay raise may constitute an adverse employment action. *See, e.g., Shu-Hui Wu v. Mississippi State Univ.*, 626 F. App'x 535, 539 (5th Cir. 2015). Miller offers no evidence to demonstrate any causal nexus between her filing the EEOC complaint or voicing her concerns to the administration and the denial of a merit-based salary increase. For example, Miller has not shown that others who were denied tenure had been given a merit pay increase. *See Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 807 (5th Cir. 2007) (finding no evidence of retaliation where the plaintiff "has not shown that she was treated more harshly than other employees under similar circumstances").

On the other hand, the university has provided evidence that its general practice was to not grant merit increases after denying a faculty member tenure. (70-5 at 7)

14

To the extent that Miller can state a prima facie case of retaliation, she cannot show the but-for causation required in the final step of the burden-shifting framework. At that step, "temporal proximity alone is insufficient to prove but for causation." *See Strong*, 482 F.3d at 808. As already discussed, SHSU's denial of tenure to Miller was non-discriminatory. Because SHSU had a general practice to deny a pay raise to someone who is denied tenure, Miller has not shown that her protected activity was the but-for cause of the merit increase denial.

No reasonable factfinder can find that SHSU retaliated against Miller for any activity protected under Title VII. A summary judgment is proper.

C. *Hostile work environment*

Title VII prohibits employment discrimination by harassment. *See* 42 U.S.C. § 2000e–2(a)(1); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–23 (1993); *Gardner v. CLC of Pascagoula, L.L.C.*, 915 F.3d 320, 325 (5th Cir. 2019), *as revised* (Feb. 7, 2019). "[S]exual harassment is actionable under Title VII only if it is so severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment." *Clark Cty. Sch. Dist.*, 532 U.S. at 270 (internal quotation marks omitted).

To establish a prima facie case of discrimination by the creation of a hostile work environment, the plaintiff must show that she (a) belongs to a protected group; (b) was subjected to unwelcome harassment; (c) the harassment complained of was based on the membership in the protected group; (d) the harassment complained of affected a term, condition, or privilege of employment; and (e) the employer knew or should have known of the harassment in question and failed to take prompt remedial action. *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012).

Miller has not demonstrated a prima facie case of a hostile work environment. She argues that the administrators and male faculty members of the Clindoc Program regularly made disparaging statements about women. Miller alleges that R. Miller made "sexist"

comments when he told her that she should be more pleasant, restrained, and cheery. Even if these statements were offensive to Miller, it is not clear the statements were based on her membership in a protected class. She also cannot show that the statements affected a term, condition, or privilege of Miller's employment. "The 'mere utterance of an epithet which engenders offensive feelings in an employee' does not sufficiently affect the conditions of employment." *Shepherd v. Comptroller of Pub. Accounts of State of Texas*, 168 F.3d 871, 874 (5th Cir. 1999) (citing *Harris*, 510 U.S. at 21) (the complained-of statements alluding to the plaintiff's body were offensive but not severe, and there was no evidence that those statements "undermine[d] [the plaintiff's] workplace competence").

Miller also alleges that some of her colleagues referred to women as "bitch." She alleges that a male professor said, "what a crazy bitch," referring to a female instructor, during a Clindoc Program faculty meeting in November 2012. (*See* 80-19 at 22.) She also offers an email chain from February 2013 in which a different male professor described a student as sometimes being "bitchy." (*See* 81-1 at 1.) Routine use of a universally recognized slur in the presence of persons against whom that slur is directed can be evidence of discriminatory animus. *See, e.g., Brown v. E. Mississippi Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir. 1993) (finding that a supervisor's consistent use of the "n—" word was evidence of racial discrimination); *see also Jackson v. Cal W. Packaging Corp.*, No. CIV.A. H-08-862, 2009 WL 1562221, at *6 (S.D. Tex. June 3, 2009), *aff'd sub nom. Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374 (5th Cir. 2010) (collecting cases). Unlike in *Brown*, Miller has not shown that the word "bitch" was routinely used among the Clindoc Program faculty. The examples she cites are one-off remarks or statements taken out of context. They did not constitute harassment and did not affect a term, condition, or privilege of Miller's employment. *See Friend v. Interior Sys., Inc.*, No. 3:00CV-2170-P, 2002 WL 1058210, at *25 (N.D. Tex. May 23, 2002), *aff'd*, 69 F. App'x 659 (5th Cir. 2003) ("[T]hese isolated comments do not constitute a hostile environment; they are

stray remarks that do not rise to the level of actionable harassment."); *cf. Reed v. Neopost USA, Inc.*, 701 F.3d 434, 443 (5th Cir. 2012) (finding no hostile work environment under state law, on allegation of sporadic remarks which offended the plaintiff, in the absence of the plaintiff's explanation of how those remarks interfered with his job performance).

Because Miller cannot show that she was subject to any harassment during her employment with SHSU, her hostile work environment claim must be dismissed on summary judgment.

### 5. *Unequal Pay Claims*

Miller argues that SHSU violated the Equal Pay Act (EPA) of 1963, Pub. L. No. 88–38, 77 Stat. 56 (codified as amended at 29 U.S.C. § 206(d)) and the Lily Ledbetter Fair Pay Act of 2009, Pub. L. No. 111–2, 123 St. 5 (codified as amended at 42 U.S.C. § 2000e-5(e)). Both Title VII and the EPA prohibit employers from discriminating in compensation based on sex. *See* 42 U.S.C. § 2000e-2(a)(1); 29 U.S.C. § 206(d)(1).

To state a prima facie claim of wage discrimination under either the EPA or Title VII, Miller must show that SHSU compensated her differently from comparators for equal work. *Siler-Khodr v. Univ. of Texas Health Sci. Ctr. San Antonio*, 261 F.3d 542, 546 (5th Cir. 2001) (construing EPA); *Pittman v. Hattiesburg Mun. Separate Sch. Dist.*, 644 F.2d 1071, 1074 (5th Cir. 1981) (construing Title VII). The EPA does not require that the comparator's job be identical to the plaintiff's, but the EPA "necessarily requires a plaintiff to compare her skill, effort, responsibility and salary with a person who is or was similarly situated." *Jones v. Flagship Int'l*, 793 F.2d 714, 723 (5th Cir. 1986). Likewise, Title VII requires a showing that the comparator worked under circumstances "nearly identical" to the plaintiff's. *Weaver v. Basic Energy Servs., L.P.*, 578 F. App'x 449, 451 (5th Cir. 2014) (citing *Willis v. Cleco Corp.*, 749 F.3d 314, 320 (5th Cir. 2014)).

Miller alleges that her salary was less than 90% of her male comparator, Jorge Varela, who was one year behind her on the tenure track. Miller has not shown that her comparator was similarly situated to her. She argues that Jorge Varela was, like Miller, a tenure-track

Assistant Professor in the Clindoc Program. On the other hand, SHSU has shown that Varela had elevated job responsibilities as a licensed psychologist in Texas. Miller does not dispute that clinical supervision was a core responsibility for Clindoc Program faculty members, which required them to be licensed as a psychologist in Texas. SHSU has shown that Varela obtained his license in 2001, before joining the faculty, whereas Miller obtained her license in 2011, years after starting her position at the Clindoc Program. (70-2 at 27–28, 70-5 at 9, 70-6 at 4) SHSU has also offered evidence that Miller's delay in obtaining her license required the university to devote extra resources to assist her, such as assigning a licensed staff psychologist to "meta-supervise" her students. (70-6 at 4) Because Varela did not require those extra resources in supervising his students, their work was not equal. Because he was licensed ten years before Miller, he is not similarly situated with her. *See E.E.O.C. v. TXI Operations, L.P.*, 394 F. Supp. 2d 868, 877 (N.D. Tex. 2005) (holding that an employee who has a more elevated job responsibility than the plaintiff is not similarly situated with the plaintiff even if that employee works in the same department with the same job title).

A summary judgment is proper.

6. *Conclusion*

The summary judgment record does not raise any genuine issue of material fact. Sam Houston State University's motion for summary judgment (70) is granted.

Audrey Miller takes nothing from Sam Houston State University.

Signed on September 30, 2019, at Houston, Texas.

Lynn N. Hughes
United States District Judge