United States District Court
Southern District of Texas
**ENTERED**
April 11, 2024
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| AUDREY K MILLER, | § | |
| | § | |
| *Plaintiff*, | § | |
| v. | § | CIVIL ACTION NO. 4:15-cv-2824 |
| | § | |
| SAM HOUSTON STATE UNIVERSITY | § | |
| And TEXAS STATE UNIVERSITY | § | |
| SYSTEM, | § | |
| | § | |
| *Defendants*. | § | |

## ORDER

Pending before the Court is Defendants Sam Houston State University ("SHSU") and Texas State University System ("TSUS") (collectively the "Defendants") Amended Motion for Summary Judgment. (Doc. No. 216). Plaintiff Audrey K. Miller ("Miller" or "Plaintiff") responded in opposition. (Doc. No. 231). Defendants filed a Reply. (Doc. No. 234). After considering the motions, the admissible evidence, and the law, the Court **DENIES IN PART and GRANTS IN PART** Defendants' Motion for Summary Judgment. (Doc. No. 216).

### I.    Background

Plaintiff brought this employment action against Defendants, alleging that Defendants violated Title VII by discriminating against her on the basis of sex and retaliating against her. Specifically, Plaintiff alleges that Defendants created a hostile work environment and denied her a tenured position based on her gender. (Doc. No. 1 at 5).

Plaintiff has her Ph.D. in Clinical Psychology and completed a postdoctoral fellowship in Clinical-Forensic Psychology. After finishing her studies, but before she became licensed, Plaintiff became a tenure-track Assistant Professor in the Clinical Doctoral Program ("Clindoc") in the

Psychology and Philosophy Department at Sam Houston State University ("SHSU"). While teaching at SHSU, she published numerous articles, a book chapter, and made many presentations. After working for SHSU for approximately five years, Plaintiff applied for Associate Professor with Tenure, but her application was denied. Plaintiff alleges that she was denied the promotion and tenure because of her gender and because she had raised concerns about the mistreatment of women in her department before applying for the position.

SHSU's promotion and tenure process involves multiple levels of review, including by a professors' peers and academic administrators. In the Psychology Department, this includes an annual review of an assistant professor's work by the Department Promotion and Tenure Advisory Committee ("DPTAC"). In a 2013 letter prepared and approved by all members of the committee, the DPTAC summarized its consideration of Plaintiff's promotion and tenure application. (Doc. No. 216-1, at 189-192, 138). The overall conclusion of the letter was that the DPTAC did not recommend Miller receive a tenured position. The DPTAC acknowledged that the lack of support for Plaintiff's application was not based on "[d]oubts about Dr. Miller's scholarship" or "concerns about her service to our institution and profession." (*Id.* at 189). Instead, the DPTAC focused on "other aspects of Dr. Miller's teaching performance— specifically, her research mentoring and clinical supervision—that caused most of us grave concern." (*Id.* at 190). The DPTAC noted that Plaintiff's behavior on four separate thesis and dissertation committees was "highly problematic" and that her "inflexibility has been very perplexing." (*Id.*). The DPTAC also recognized that faculty members had experienced issues with Plaintiff's "insensitivity" toward students in their research and clinical work. (*Id.*). In light of all this information, the DPTAC believed that Plaintiff's behavior was "harmful to our students" and "called into question her utility as a member of both our doctoral program faculty and our Department as a whole." (Doc. No. 216 at 14).

2

Plaintiff maintains that these concerns about her collegiality are pretextual. She argues that many male colleagues (who ultimately received tenure) engaged in the same conduct that got her labeled as non-collegial, and that the department had generally perpetuated a "boys club." As for the general culture of the department, Plaintiff alleges (and has presented some evidence) that female faculty members were assigned disproportionately more students to mentor than their male colleagues, while receiving fewer paid course releases[1] than their male colleagues. Additionally, Plaintiff recalls repeatedly being called "little lady" by the DPTAC Committee Chair, Roland Miller. DPTAC Chair Miller also allegedly stated, while reviewing a female graduate student candidate, that he does not like "strong women." Plaintiff recalls being asked in a faculty meeting whether she wanted children. Similarly, she remembers being asked about her new marriage and whether any problems had yet occurred during an unrelated conversation about her upcoming tenure application. She alleges that she was not the only woman subjected to these comments. She claims to have witnessed fellow faculty members calling a female colleague a "crazy bitch" and witnessing a male colleague referring to a prospective female student as "bitchy."

With respect to her tenure denial, and the events leading up to it, Miller alleges that the first time she learned of any collegiality problems were in her 2012 review letter (her tenure denial was one year later in 2013). She was concerned because she believed she was being labeled an "obstructionist." She had been removed from the thesis/dissertations committee after raising concerns about and objecting to students' dissertations. Meanwhile, she notes that other male colleagues had similarly expressed concerns about and objected to students' dissertations without facing backlash. For example, male faculty member Robert Cramer decided that a student's project

---

[1] Based on the record, a paid course release appears to a way to alleviate the burdensome demands of the expected teaching load (three courses per semester) and to allow tenure-track faculty to advance other parts of their professional development such as publication and licensing.

was not going to work and disallowed the project's continuation. Cramer was not removed from the committee as a result.

After receiving her 2012 review letter, Miller sought to have the collegiality comments removed, perhaps believing that they would become the reason for denying her tenure. She emailed DPTAC committee members, including Committee Chair Miller and Department Chair Wilson, to obtain feedback seeking more specific feedback. Two committee members, Marc Boccaccini and Craig Henderson, responded and met with Miller. Boccaccini allegedly told Miller that collegiality "was not a legitimate criterion to deny promotion/tenure, as he knew a male professor, [omitted], had been criticized for his collegiality but was still granted promotion/tenure." (Doc. No. 231 at 12).

After receiving responses from only two DPTAC members, and still having concerns about the collegiality comments, Plaintiff decided to pursue the faculty grievance procedure. According to this procedure, Miller was required to discuss any grievances with her department chair first, then with the college dean, and if the matter still went unresolved, with the Provost and Vice President of Academic Affairs. Accordingly, she met with Department Chair Wilson and requested that the collegiality comments be removed from her 2012 DPTAC letter because she believed the comments were because she was a woman.  Miller alleges that Wilson told her to "lay low," stop complaining about her workload, and "keep her mouth shut" on student research committees. (Doc. No. 231 at 17). He then told her that the collegiality comments would not be removed from her review letter.

She then proceeded to the second step of the grievance procedure in which she met with Dean John de Castro. He allegedly told her that the 2012 review letter was "poisonous" and that she needed to be careful as an untenured faculty member. (Doc. No. 82-17). He then told her that

he could not do anything about the collegiality comments on her 2012 review letter, and that even if he could, the committee would likely say the same remarks in the eventual tenure letter. (*Id.*).

Unsatisfied, Plaintiff then pursued the third step of the grievance procedure in which she met with Provost Jaimie Hebert. Plaintiff recorded this meeting[2] and provided a transcript to the Court. (Doc. No. 92-19). Plaintiff expressed her concern about the collegiality comments, about having twice as many students to supervise, and about Department Chair Wilson telling her to be quiet on thesis committees. (Doc. No. 82-19). She also specifically mentioned her concern that her collegiality comments were about her gender because there were not many females in the department, especially junior females, and so she was concerned there was "some stereotypic view of, like, a female is not supposed to have a differing academic view, or you know, how dare me sort of ask about my workload. I mean . . . nobody has given me anything instructive about what the collegiality concerns are." (*Id.* at 29). Provost Hebert mentioned that the collegiality comments were "odd general statements" and advised Miller to speak to DPTAC Committee Chair Miller to clarify the impact that these statements might have on her tenure application.

Miller then met with DPTAC Committee Chair Miller, who told her that she should not be worried "on the basis of teaching and scholarship and service, the stuff that matters." (Doc. No. 80-14). He then advised her to "be pleasant. You know, instead of running through the hall with your brow furrowed and busy, as so often you do." (*Id.* at 45). Miller was told to tell her older male colleagues "Hi. How you doing? Good to see ya," which Committee Chair Miller allegedly demonstrated in a high-pitched, feminine voice. (Doc. No. 231 at 15).

Then, in January of 2013, Miller submitted her promotion and tenure dossier. (Doc. No. 83-20). The DPTAC committee met on February 4 to review this application, and then one day

---

[2] It is unclear from the record whether Plaintiff recorded the conversation in secret or whether the Provost Hebert was aware of the recording.

later on February 5, 2013, Committee Chair Miller sent Department Chair Wilson a draft letter, recommending she be denied. The DPTAC letter stated that Miller had been productive, achieved scholarly success, and referenced some favorable comments by her external reviewers. Miller contends that it severely underrepresented her exemplary teaching scores. Perhaps most importantly, according to Miller, while the letter suggested that Miller's relationships with students were part of the reason for denying her tenure, the letter omitted any mention of multiple mentorship awards for which students had nominated Miller for her clinical supervision and mentorship. In fact, Miller's application stated that 12 students were actively assisting on publications and presentations with her, and more than 20 additional students actively expressing interest in working with her at that time.

Miller alleges that while the DPTAC omitted these *positive* portions of her application in her letter, the DPTAC had omitted *negative* portions of other, male colleagues' applications in theirs. For example, the DPTAC letter for a male faculty member omitted unfavorable comments from one external reviewer that stated his development as a scholar and researcher was just "average to below average." (Doc. No. 231 at 17). Based upon these omissions and the quick turnaround of her letter, Miller alleges that the DPTAC did not fairly consider her promotion and tenure application and that the true reason for her denial is her gender.

After Plaintiff was denied tenure, she claims that she appealed SHSU's promotion/tenure denial to the TSUS Board of Regents, but they claimed that they had no authority to respond and did not address or remedy her situation. (Doc. No. 231 at 23). Plaintiff also filed a charge of sex discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") in connection with her promotion and tenure denial at SHSU. Finally, she claims that she was close to obtaining a position at University of Houston Downtown ("UHD"), but that after a phone call

6

with Wilson, UHD no longer considered her. She initially filed this lawsuit in September of 2015.

In the lawsuit she brings the following claims: (1) Title VII gender discrimination claim, (2) Title

VII retaliation claim, (3) Title VII hostile work environment claim, and (4) Equal Pay Act claim.

In September of 2019, Judge Hughes issued an opinion granting summary judgment. (Doc.

No. 117). Plaintiff appealed, and the Fifth Circuit reversed the grant of summary judgment because

"the court's discovery restrictions suffocated any chance for Miller fairly to present her claims."

*Miller v. Sam Houston State Univ.*, 986 F.3d 880, 892 (5th Cir. 2021). The Fifth Circuit also

reversed Judge Hughes' earlier *sua sponte* dismissal of TSUS.   Accordingly, the Fifth Circuit

remanded and reassigned Plaintiff's case to this Court in February of 2021, and Miller has since

had 30 months to conduct any discovery necessary to fairly present her claims on summary

judgment.

## II.      Legal Standard

Summary judgment is warranted "if the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). "The movant bears the burden of identifying those portions of the record it believes

demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*,

485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

Once a movant submits a properly supported motion, the burden shifts to the non-movant

to show that the court should not grant the motion. *Celotex*, 477 U.S. at 321–25. The non-movant

then must provide specific facts showing that there is a genuine dispute. *Id.* at 324; *Matsushita

Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A dispute about a material fact

is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must draw all

reasonable inferences in the light most favorable to the nonmoving party in deciding a summary

judgment motion. *Id.* at 255. The key question on summary judgment is whether there is evidence

raising an issue of material fact upon which a hypothetical, reasonable factfinder could find in

favor of the nonmoving party. *Id.* at 248. It is the responsibility of the parties to specifically point

the Court to the pertinent evidence, and its location, in the record that the party thinks are relevant.

*Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). It is not the duty of the Court to search

the record for evidence that might establish an issue of material fact. *Id.*

### III.  Analysis

Defendants argue that Plaintiff cannot raise a fact issue on any of her claims: (1) Title VII

gender discrimination claim, (2) Title VII retaliation claim, (3) Title VII hostile work environment

claim, and (4) Equal Pay Act. Moreover, TSUS argues that it was not Plaintiff's employer and, as

such, should be dismissed from the lawsuit.

As an initial matter, Defendants object to various exhibits and parts of exhibits that Plaintiff

attached to her Response. (Doc. No. 184 at 22-27). In particular, Defendants argue that certain

paragraphs contained in Plaintiff's declaration are not admissible based on relevance, speculation,

lack of personal knowledge, and hearsay. (Doc. No. 234 at 2).

The Court notes as a general matter that an individual does not have personal knowledge

of an event if the person acquired that knowledge from another document or source rather than

from the individual's personal perception. *See* Fed. R. Evid. 602 Advisory Committee Notes

(1973). Additionally, any statement that is out of court and offered for its truth is inadmissible;

classifying certain documents as "testimonial statements to this Court" does not change the nature

of the evidence. If a statement is made outside of testifying at the current trial or hearing, it is

inadmissible hearsay unless it is demonstrated that it meets one of the outlined exceptions. *See* Fed. R. Evid. 801.

The Court will only address specific objections further if the evidence becomes relevant to the Court's analysis.

In addition, Plaintiff filed what appears to be a supplement to her summary judgment response and Motion for Continuance to File an Amended Response to Defendants' Motion for Summary Judgment. (Doc. No. 236). She filed this motion response roughly one week after her initial response was filed. The relief requested in this motion is somewhat unclear—Plaintiff appears to want to continue discovery, depose Department Chair Wilson, and then refile her summary judgment response.  Defendants responded in opposition. (Doc. No. 237). While the Court will consider the competent summary judgment evidence attached to this motion if it can locate that evidence (Doc. No. 263-1), the Court denies the requested continuance. Plaintiff has had over 30 months to conduct discovery, and she has deposed 16 witnesses. Plaintiff does not dispute that Chair Wilson is apparently living in Europe and is outside the subpoena range. She does not detail any attempts to depose him there. This case has been pending for a substantial period of time, and the Court does not believe that any further delay is in the interest of justice. Therefore, Plaintiff's Motion to Continue (Doc. No. 236) is hereby **DENIED**, and her original summary judgment response (Doc. No. 234) is the operative response, though the Court will consider any properly proven and cited evidence that is attached to her Motion to Continue in its analysis.

### A.  *Whether TSUS is Plaintiff's Employer*

In deciding whether Plaintiff can proceed to trial with her claims against TSUS, the Court must determine if TSUS was Plaintiff's "employer" under Title VII. If an entity is not the

Plaintiff's employer, then it is not a proper defendant under Title VII. *See Weeks v. Tex. A&M Univ. Sys.*, 762 F. App'x 203 (5th Cir. 2019). Importantly, Plaintiff does not argue that TSUS and SHSU are the same entity for the purpose of Title VII analysis. (Doc. No. 176 at 64). Plaintiff instead argues that TSUS is a proper defendant even though it is a separate entity because it "controlled" the SHSU hiring process. (Doc. No. 176 at 64).

The Fifth Circuit has held that the determination of employer status for Title VII purposes requires a two-part analysis. *Muhammad v. Dallas Cty. Cmty. Supervision and Corr. Dep't.*, 479 F.3d 377, 380 (5th Cir. 2007). First, a court looks to whether the defendants meet the statutory definition of employer; that is, the defendant must be "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding year." 42 U.S.C. § 2000e(b). Second, the court considers whether the requisite employment relationship exists by applying a "hybrid economic realities/common law control test." *Muhammad*, 479 F.3d at 380. The test first focuses on whether the defendant has the right to hire, fire, supervise, and set a work schedule for employees. *Id.* The Fifth Circuit has referred to this portion as the "control component." *Miller v. Sam Houston State Univ.*, 986 F.3d 880, 890 (5th Cir. 2021). Additionally, courts should consider the "economic realities" component, in which courts examine "whether the defendant in question paid the employee's salary, withheld taxes, provided benefits, and set terms and conditions of employment." *Id.*

Here, Defendants argue that TSUS was not Miller's employer. They point to the Tex. Educ. Code. § 61.003(8) and 61.003(6) under which TSUS is a separate entity from SHSU. They argue that Miller lacks evidence that TSUS has the right to control Plaintiff's conduct, and thus TSUS

should be dismissed as not her employer. *See Weeks v. Tex. A&M Univ. Sys.*, 762 F. App'x 203 (5th Cir. 2019).

> In response, Plaintiff points to the previous Fifth Circuit decision in this case. She argues:
>
> The Fifth Circuit elaborated the problematic dismissal of TSUS specifically, given Plaintiff had produced evidence that the System's own Rules and Regulations indicated TSUS was "responsible for managing and controlling their universities," including in the granting of tenure (see ECF No. 36 to 36-2). The Court noted that this appeared to meet at least the "control component" of the two-step process for determining whether a defendant is an "employer" under Title VII.

(Doc. No. 231 at 1). Aside from this paragraph, Plaintiff mentions TSUS only a handful of other times and does not present any evidence regarding TSUS.

Plaintiff is correct that the Fifth Circuit reversed the prior dismissal of TSUS. The Fifth Circuit's reasoning, however, is not as Plaintiff describes it. The Fifth Circuit did not appear to engage with any evidence or suggest that Plaintiff had met either component of the economic realities/common law control test. Rather, the Fifth Circuit examined Plaintiff's *pleadings* as was proper at the motion to dismiss stage. In doing so, the Circuit noted that the economic realities/common law control test is "necessarily a fact-specific inquiry and **is therefore typically applied in a summary judgment context**, in which a court is permitted to go beyond the pleadings and examine the state law and the evidence relevant to the employment relationship." *Miller*, 986 F.3d at 890 (quoting *Muhammad v. Dallas Cnty. Cmty. Supervision & Corrs. Dept.*, 479 F.3d 377, 382 (5th Cir. 2007)) (emphasis added).

Here, at the summary judgment stage, Miller has cited to no evidence that the System (1) has the right to hire, fire, supervise, and set a work schedule for employees, or (2) paid her salary, withheld taxes, provided benefits, and set terms and conditions of employment. In fact, one of the few times she mentions TSUS, she argues that she "appealed the promotion/tenure denial to the TSUS Board of Regents, but they disregarded the opportunity to remedy the situation, falsely

claiming they had no authority to respond." (Doc. No. 231 at 23). Miller failed to provide evidence of this decision by TSUS, must less any evidence contradicting its alleged assertion that it lacked authority.[3] Therefore, given the absence of evidence, there is no fact issue that TSUS was Miller's employer. Defendants' summary judgment motion is therefore **GRANTED** as to TSUS. (Doc. No. 216).

   *B. Equal Pay*

   As noted above, SHSU argues that Plaintiff cannot present a fact issue on any of her claims, including her claims under the Equal Pay Act ("EPA"). To establish a prima facie case under the EPA, a plaintiff must demonstrate, among other things, that "she performed work in a position requiring equal skill, effort, and responsibility under similar working conditions"; and that she was "paid less than the employee of the opposite sex providing the basis of comparison." *Chance v. Rice Univ.*, 984 F.2d 151, 153 (5th Cir. 1993). If the plaintiff makes out a *prima facie* case, the burden shifts to the employer to establish that the pay difference is justified under one of the EPA's exceptions, which include an employer's merit system and "a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1).

   Here, the only comparator named by Plaintiff to support her EPA claim is a male colleague, Jorge Varela. (Doc. No. 1 at ¶ 49, Doc. No. 216-1 at 66).  SHSU argues that, while both Varela and Miller were Assistant Professors of Psychology in the Clindoc program, their circumstances were not "nearly identical" as is required. *Weaver v. Basic Energy Servs., L.P.*, 578 F. App'x 449, 451 (5th Cir. 2014). Most significantly, Miller was not licensed to practice psychology in Texas

---

[3] At best, Miller has cited to the letter she received offering her a tenure-track position at SHSU. (Doc. No. 78-6). This letter, written by an employee of SHSU, states only that "This offer, of course, is subject to the approval of the President of Sam Houston State University and the Board of Regents of The Texas State University System." (*Id.*). Even if that statement were true, and that the Board of Regents had the authority to approve her offer of employment, this is insufficient to raise a genuine issue of fact that TSUS was Miller's employer under the economic realities/control test.

until nearly four years after she was hired at SHSU, while Varela joined SHSU with a Texas license. (Doc. No. 216-1 at 29, 113-114). As such, for most of her employment at SHSU, Plaintiff's clinical supervision—a critical component to the Clindoc program—had to be overseen by a licensed staff member. (*Id.* at 130). By contrast, licensed psychologists like Varela could perform supervision without oversight by another faculty or staff member. (*Id.*). SHSU argues that because Varela did not require those extra resources in supervising his students, these two were not similarly situated.

In response, Plaintiff has presented no evidence that she was paid less than a similarly situated employee of the opposite sex as is required by the EPA. In fact, Plaintiff does not even address her EPA claims in her response. She does not articulate the legal standards for presenting a *prima facie* case, nor does she cite to any evidence supporting her claim. Specifically, she does not argue or provide any evidence that Varela (or any other faculty member) was similarly situated to her. Moreover, she provides no evidence contradicting SHSU's evidence that Varela had more experience prior to being hired and had already received his Texas license seven years before he began working at SHSU. In short, by failing to respond to this claim, Plaintiff has essentially waived this claim. *See Kitchen v. BASF*, 952 F.3d 247, 253 (5th Cir. 2020) ("Because Kitchen did not present this argument to the district court, and he makes no attempt to demonstrate extraordinary circumstances for why we should consider it, this argument is waived").

With no evidence or argument to the contrary, all summary judgment evidence demonstrates that Varela was licensed before he was hired, while Miller was unlicensed until four years into her position. Varela therefore cannot be said to be similarly situated to Miller. Accordingly, Plaintiff has failed to meet her burden of demonstrating a genuine issue of material

13

fact. The Court hereby **GRANTS** Defendant's motion for summary judgment as to Plaintiff's EPA claim.

### C.  Disparate Treatment Discrimination

As noted above, Defendants moved for summary judgment on all of Plaintiff's claims, including her claim for disparate treatment discrimination under Title VII based on her gender.

Under Title VII, it is unlawful to discriminate against an employee on the basis of sex. 42 U.S.C. § 2000e–2(a). In a disparate treatment case, an employee must establish that her employer had a discriminatory intent or motive for taking a job-related action. *Ricci v. DeStefano*, 557 U.S. 557 (2009). As direct evidence of discriminatory intent is rare, an employee ordinarily proves her claim through circumstantial evidence. *Scales v. Slater*, 181 F.3d 703, 709 (5th Cir. 1999). When an employee offers circumstantial evidence, the burden-shifting analysis introduced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) governs. This framework first requires the employee to establish a prima facie case of discrimination. *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir. 2001).

In *McDonnell Douglas*, the Supreme Court set out "an appropriate model for a prima facie case of racial discrimination." *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 n.6 (1981). In doing so, it observed that "the *prima facie* proof required from respondent is not necessarily applicable in every respect to differing factual situations." *McDonnell Douglas*, 411 U.S. at 802 n.13 (5th Cir. 2012) ("The prima facie case is necessarily a flexible standard that must be adapted to the factual circumstances of the case."). Although the ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination, *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153,

(2000), the precise formulation for making a *prima facie* case can vary by circuit and, more granularly, by protected class and adverse employment action.

To establish a prima facie case of sex discrimination based on disparate treatment in the Fifth Circuit, an employee generally must demonstrate that "(1) she is a member of a protected class; (2) she was qualified for the position she sought; (3) she suffered an adverse employment action; and (4) others similarly situated but outside the protected class were treated more favorably." *Alvarado v. Tex. Rangers*, 492 F.3d 605, 611 (5th Cir. 2007). To satisfy the "similarly situated" prong, the employee carries out a comparator analysis. *See Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253 (5th Cir. 2009). Under this analysis, the employee must establish that she was treated less favorably than a similarly situated employee outside of her protected class in nearly identical circumstances. *See id.* at 259–60 (citing *McDonnell Douglas*, 411 U.S. at 802). The similarly situated employee is known as a comparator. "A variety of factors are considered when determining whether a comparator is similarly situated, including job responsibility, experience, and qualifications." *Herster v. Bd. of Supervisors of La. State Univ.*, 887 F.3d 177, 185 (5th Cir. 2018). Moreover, the Fifth Circuit requires an employee to show that the comparator's conduct is "nearly identical," not strictly identical. *Lee*, 574 F.3d at 260 n.25.

After an employee makes a prima facie case under the *McDonnell Douglas* framework, the burden of production shifts to the employer to offer an alternative non-discriminatory explanation for the adverse employment action, at which point the employee must show that this explanation is pretextual. *See Lee*, 574 F.3d at 259 (citing *McDonnell Douglas*, 411 U.S. at 802). Notably, the burden of proof remains with the employee throughout. *See id.* at 259 n.13; *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 518 (1993) (quoting *Burdine*, 450 U.S. at 253 ("The ultimate burden of

persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.")).

Here, the heart of Plaintiff's case is the claim that she was denied tenure because of her gender. After considering the briefings, the applicable law, and the competent summary judgment evidence, the Court finds that Plaintiff has met her minimal burden to survive summary judgment by raising a genuine issue of fact for her disparate treatment discrimination claim based this tenure denial. There is some evidence supporting a *prima facie* case of discrimination, as well as some evidence that SHSU's proffered legitimate, nondiscriminatory explanation—lack of collegiality— is pretextual. For example, Plaintiff has provided evidence that female faculty members received fewer paid course releases than their male colleagues, that male colleagues had engaged in similar critiques of students' dissertation work as Miller had but had not been labeled obstructionist, and that her 2013 DPTAC tenure letter stated that her relationship with students was problematic while omitting mention of multiple mentorship awards for which students had nominated Miller.

Moreover, Miller has presented evidence that the tenure process typically takes two to three weeks for the DPTAC committee to craft a letter and send it to the chair after having a meeting about the candidate. (Doc. No. 232-4 at 157). With Miller's application, however, it appears that this process took less than one week. Evidence suggests that the DPTAC committee held a meeting for Miller on February 4, 2013, and its letter concerning her tenure application was sent to Chair Wilson as early as February 6, 2013. (Doc. No. 236-5 at 1). There are several internal emails among the DPTAC members during this time editing the letter and discussing their review of Miller's portfolio, including, perhaps most concerning, one that states "Some of us reviewed it [Miller's portfolio] without checking it out. On the down low." (*Id.*). Other emails suggest ways to revise the letter, asking "do we want to give ammunition for a lawsuit in which all of us will

likely be named? I do not think she will win. I almost wonder if we should run it by [omitted], the Systems attorney, since we think she will sue." (Doc. No. 236-6 at 1). Another email tweaked potentially culturally insensitive language in consideration of how it will be received by a "jury member." (*Id.* at 2). The Court finds that, viewing the evidence in the light most favorable to Plaintiff, she has presented sufficient evidence to survive summary judgment on her disparate treatment claim for discrimination based on her tenure denial. The Court therefore **DENIES** Defendants' summary judgment motion (Doc. No. 216) on this claim.

### D. Retaliation

The Court next must address Defendant's motion for summary judgment as to Plaintiff's retaliation claim. To prevail on a retaliation claim, a plaintiff must first establish a *prima facie* case. *Brandon v. Sage Corp.*, 808 F.3d 266, 270 (5th Cir. 2015). This requires the plaintiff to demonstrate that (1) she engaged in activity protected by Title VII; (2) she suffered an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse action. *Id.*; *accord Feist v. La. Dep't of Justice, Office of the Att'y Gen.*, 730 F.3d 450, 454 (5th Cir. 2013).

Protected activity under Title VII means the employee "has either (1) opposed any practice made an unlawful employment practice by Title VII or (2) made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII." *McCoy v. City of Shreveport*, 492 F.3d 551, 561 n.28 (5th Cir. 2007) (citation and internal quotation marks omitted). For purposes of a retaliation claim, an "adverse employment action" is any action that may dissuade a reasonable worker from making or supporting a charge of discrimination. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

When a plaintiff presents solely circumstantial evidence to advance a retaliation claim under Title VII, the *McDonnell Douglas* framework applies. *See McCoy*, 492 F.3d at 556. As such, if a plaintiff establishes a *prima facie* case, the burden shifts to the employer to state a legitimate, non-retaliatory reason for its employment decision. *Hernandez v. Yellow Trans. Inc.*, 670 F.3d 644, 657 (5th Cir. 2012). After the employer satisfies its burden, the employee must "demonstrate that the employer's reason is actually a pretext for retaliation." *Feist*, 730 F.3d at 454 (citation and internal quotation marks omitted). This is accomplished by showing "that the adverse action would not have occurred 'but for' the employer's retaliatory motive." *Id.* (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013)). To avoid summary judgment, the plaintiff must show "a conflict in substantial evidence on the question of whether the employer would not have taken the action but for the protected activity." *Feist*, 730 F.3d at 454. In determining whether an adverse action was taken as a result of retaliation, the "focus is on the final decisionmaker." *Gee v. Principi*, 289 F.3d 342, 346 (5th Cir. 2002).

Here, Defendant SHSU argues that Miller has failed to establish a *prima facie* case of retaliation because she did not engage in statutorily protected activity before filing her EEOC charge in May of 2013. SHSU argues that Miller's retaliation allegations are focused entirely on actions that occurred before she filed her EEOC charge (her promotion and tenure denial). SHSU appears to argue that, prior to filing her EEOC charge, Miller's only complaints were about supervision workload and did not involve complaints about gender-based discrimination. Since these complaints were about workload and not discrimination, SHSU contends that these complaints do not constitute protected activity.

Plaintiff's argument in response is vague and unspecific. Plaintiff appears to recite the legal standard for a retaliation claim without providing argument or evidentiary support for how that

standard applies to her case. For example, Plaintiff argues that "Defendants had timely knowledge of her protected activity, and yet took adverse actions against her; she further has demonstrated causal linkage between her protected activities and Defendants' adverse actions." (Doc. No.234 at 24). Plaintiff never specifies *what* her alleged protected activity was or who exactly knew about it. The Court reiterates that it is not the duty of the Court to search the record for a fact issue. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003).[4]

That being said, the Court sees two potential instances of protected activity based on the lengthy facts section in Plaintiff's brief. First, in Plaintiff's declaration, she stated the following:

> I opposed discriminatory hiring practices and faced backlash for doing so. On February 6, 2012, I emailed Dept. Chair Wilson and Clindoc faculty members to suggest that a statement be added to a draft job ad to encourage women and minorities to apply, stating, "This priority would be awesome." Three days later, Chair Wilson informed me that he had not selected me to serve as a member of the search committee, even though I had volunteered, and instead had selected Varela, a male Clindoc faculty member one year behind me on the tenure track. Chair Wilson selected Varela even though I was more qualified to serve on the committee—the Clindoc Program was recruiting a faculty member who could supervise students' clinical work with child clients, work I routinely performed whereas Varela refused to do so. When I complained that Chair Wilson consistently bestowed privileges upon Varela as compared to me, Chair Wilson claimed that we would change the composition of the search committee to include a majority of women, adding this would be "interesting." However, Chair Wilson did not follow through, and the search committee was composed of a majority of male faculty, and was chaired by a man, as usual. On November 9, 2012, I urged that a female candidate be interviewed for the open position, but the recommendation was overturned by Chair Wilson and Dean de Castro, who were "lukewarm" about the female candidate. Only male candidates were selected for interviews, as usual.

---

[4] The Court finds it somewhat ironic that Plaintiff's counsel has repeatedly complained to the Court about the logistical nightmare of receiving a "document dump" from the Defendants, yet, this is exactly what Plaintiff has done to the Court. Plaintiff's summary judgment response appendix (Doc. No. 232) is 3,202 pages. These thousands of pages of documents are of little use when combined with such a limited argument section of the response brief that appears to focus exclusively on her hostile work environment claim. "Judges are not like pigs, hunting for truffles buried in briefs." *U.S. v. Dunkel*, 927 F.2d 955 (7th Cir. 1991). It is counsel's responsibility to point the Court to fact issues in the record. The Court cannot play both advocate and arbiter. Given the abundance of documents and extensive cast of characters in this case, counsel must be better prepared at trial. This Court will not continue the trend by permitting a document dump upon the jury.

(Doc. No. 74-1 at ¶ 17) (internal citations omitted). Assuming that Plaintiff can prove up the emails that she cites to in this paragraph, the Court finds that this is enough evidence to raise a fact issue that, prior to her tenure denial, Plaintiff engaged in protected activity by continuously pointing out the alleged gender-based discrimination to her department chair.

Second, after receiving her 2012 review letter containing the collegiality comments, Miller engaged in SHSU's prescribed grievance procedure, which included expressing her concerns about gender to Wilson and Provost Hebert in August of 2012. Miller specifically complained of gender discrimination, telling Provost Hebert that she felt the collegiality comments were part of an agenda against her, given there are not "very many females in [the] department…especially junior females" and she did not know if the DPTAC committee had been offended by or had a "stereotypic view" that "a female is not supposed to have a differing academic view or…ask about [her] workload." Hebert allegedly assured her that these spats should not affect a tenure decision, and that the comments about her collegiality were "odd general statements." (Doc. No. 231 at 15). These conversation, apparently audio recorded by Plaintiff, also raise a fact issue as to whether Plaintiff engaged in protected activity prior to her tenure denial and whether those responsible for her tenure denial were aware of it.

Finding a fact issue on protected activity, the Court turns to whether Plaintiff has raised a fact issue that SHSU took adverse employment action against her. The most obvious adverse employment action is her tenure denial. To a lesser extent, however, Plaintiff may also consider the phone call between Wilson and UHD to be an adverse employment action. This phone call took place after SHSU denied her tenure yet before UHD declined to offer her a position. While her argument section is devoid of this theory, Plaintiff's recitation of the facts states the following allegations with regard to this phone call:

20

On April 7, 2014, UHD Chair Jackson emailed Dept. Chair Wilson that he had tried
to reach him, and they ended up speaking that same day. The next day, Dept. Chair
Wilson felt he had to qualify or temper the statements he had made about Miller
during his reference call, stating in an email to UHD Dept. Chair Jackson that he
should have explained that the doctoral program has some tenured faculty "who are
very difficult to get along with" and "may have been the source of some of the
issues" they had spoken about. After one of the UHD candidates declined the
position and another accepted the position, on April 11, 2014, Search Chair Johnson
emailed UHD Dean Fulton the names of two additional candidates for the
remaining two positions; Miller was not among them. On April 29, 2014, Miller
contacted Search Chair Johnson and was informed that the positions at UHD had
been filled.

(Doc. No. 231 at 23) (internal citations omitted). Unlike the allegations and evidence related to her

tenure denial, these factual allegations are scant and vague at best. Plaintiff does not have any

evidence regarding what was said during this phone call, and any conclusion that Wilson gave her

a negative recommendation *because of* her protected activity is too speculative. In short, the above

paragraph is not enough to raise a fact issue that SHSU took adverse employment action against

her by giving her a poor recommendation to UHD. Thus, as to this theory of adverse employment

action, the Court **GRANTS** Defendants' motion for summary judgment. Plaintiff will not be

permitted to argue that SHSU retaliated against her by giving a poor recommendation to UHD.

By contrast, Plaintiff has succeeded in presenting a fact issue on her retaliation claims

relating to tenure denial. She has provided sufficient evidence supporting a *prima facie* case, and

given the totality of the circumstances, she has provided sufficient evidence that SHSU's proffered

explanation for her tenure denial—her collegiality—was pretextual.[5] The Court therefore finds

Defendants' arguments unavailing and finds that there is a genuine issue of material fact as to

---

[5] For example, in the letter denying Miller tenure, the DPTAC wrote "We also found it unsettling that so many snafus
had surrounded her in the final year of her probationary appointment. One's last year before a tenure decision is
typically a period in which one is on one's very best behavior; however, in this last year, in too many aspects of her
interactions with her students and colleagues, the wheels seem to have fallen off of Dr. Miller's bus." (Doc. No. 216-
1 at 192). Considering that Miller had complained of gender discrimination in the preceding year, it is possible that
her protected activity was included in the Committee's analysis of the "many snafus" Miller had had with colleagues.

Plaintiff's retaliation claim. Summary judgment is therefore **DENIED** on this claim. (Doc. No. 216).

### E. Hostile Work Environment

Defendants next challenge Plaintiff's hostile work environment claim. To establish a *prima facie* case of a hostile work environment, an employee must raise a genuine dispute of material fact that (1) she belongs to a protected class; (2) she was subject to unwelcome harassment; (3) the harassment was based on her protected characteristic; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action. *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002). The fourth element of the test is met only if the harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* at 268. Title VII does not reach "conduct that is merely offensive"—it proscribes only "an environment that a reasonable person would find hostile or abusive." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to [actionable discrimination]." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks and citation omitted).

When analyzing the *prima facie* elements of a hostile work environment claim, "it matters whether a harasser is a 'supervisor' or simply a coworker." *Matherne v. Ruba Mgmt.*, 624 Fed. App'x. 835, 839 (5th Cir. 2015). Further, "mere 'leadership responsibilities' and 'the authority to assign [job responsibilities]' are insufficient to place an employee in the 'unitary category of supervisors' with authority to cause 'a significant change in employment status.'" *Id.* at 840.

Defendant argues that they are entitled to summary judgment on this claim because while Miller complains about her departmental colleagues and her chair, they do not meet the criteria for

22

"supervisor." The burden to establish "supervisor" status falls to the plaintiff. *Pullen v. Caddo Parish Sch. Bd.*, 830 F.3d 205, 214 (5th Cir. 2016). Moreover, they argue that she has no evidence that her co-worker's comments on her collegiality were based on her gender. While Miller complains she was told "that she should be more pleasant, restrained, and cheery," there is no evidence that these statements were based on the fact she is a woman. Additionally, they argue that Miller cannot show that the intermittent comments she received were so severe as to "unreasonably interfere with [her] work performance." *See Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 347 (5th Cir. 2007).

In response to SHSU's arguments that she has failed to establish that any of her alleged harassers were supervisors, Plaintiff states that her hostile work environment claim "subsumes harassment by anyone with immediate or higher authority over Miller's employment, including Dept. Chair Wilson, DCF Conroy, Committee Chair Miller, DPTAC and CDACPT members, Dean de Castro, Provost Hebert, President Hoyt, TSUS Board members including Chancellor Brian McCall, and any other supervisor." This is nonresponsive. More damaging, Plaintiff does not identify or argue how the various comments she received and/or witnessed were "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive environment." *See Matherne*, 624 Fed. App'x. at 839.

With no argument to the contrary, and finding no evidence that any conduct toward Miller was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive environment, the Court hereby **GRANTS** Defendants' motion for summary judgment on this claim.

## IV.    Conclusion

For the many reasons above, the Court **GRANTS IN PART** and **DENIES IN PART** the Defendants' motion for summary judgment (Doc. No. 216), and **DENIES** Plaintiff's Motion for Continuance to File an Amended Response to Defendants' Motion for Summary Judgment. (Doc. No. 236). The Court grants summary judgment to Defendant TSUS on all claims. The Court grants summary judgment to SHSU on Plaintiff's EPA claim and Title VII claims for hostile work environment and retaliation to the extent that retaliation claim is based upon any adverse employment action made by Wilson speaking to UHD. The Court denies summary judgment to Defendant SHSU on Plaintiff's Title VII claims for discrimination and retaliation to the extent that retaliation claim is based upon her tenure denial/failure to promote. These two claims remain viable and will need to be tried by jury.

This matter has been pending for several years, and the Court is of the opinion that the parties have had ample time to prepare their case. As such, the Court sets this matter for a status conference on April 17, 2024, at 1:30 pm to discuss the quickest feasible timeline to take this matter to its conclusion.

SIGNED at this **11** day of April, 2024.

Andrew S. Hanen
United States District Judge

24